*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 17-FS-1104 & 17-FS-1113

IN RE J.M. & D.M.;
S.M., APPELLANT.

FILED 09/20/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(NEG-339-15 & NEG-340-15)

(Hon. Noel Johnson, Trial Judge)
(Hon. Jennifer M. Anderson, Reviewing Associate Judge)

(Argued April 18, 2018                    Decided September 20, 2018)

*Lauren B. Schwartz* for appellant S.M.

*Jon S. Pascale* filed a statement in lieu of brief, for appellee K.L.

*Pamela Soncini*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Acting Solicitor General at the time the brief was filed, and *Stacy L. Anderson*, Acting Deputy Solicitor General at the time the brief was filed, were on the brief, for appellee District of Columbia.

*Abraham Sisson*, guardian ad litem, with whom *Katherine McGiffin* and *Ileah Welch*, guardians ad litem were on the brief, for appellants J.M. and D.M.

Before THOMPSON and BECKWITH, *Associate Judges*, and PRYOR, *Senior Judge*.

THOMPSON, *Associate Judge*:   S.M. (the "Mother"), the birth mother of the minor children J.M. and D.M. (the "children"), challenges a decision of the Superior Court that changed the permanency goal for the children from concurrent goals of reunification with S.M. and adoption to a sole goal of adoption.   The Mother contends that the District of Columbia (the "District") did not show by a preponderance of the evidence that a permanency-goal change to adoption was supported by the factors this court outlined in *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc).   The District and the children's guardian ad litem (the "GAL") defend the goal change.   The District and the GAL also contend that a review in 2017 of the October 2016 permanency-goal change (in response to the Mother's March 2017 request for a *Ta.L.* hearing) was not authorized by *Ta.L.*, and the GAL argues in addition that neither a review by a Superior Court associate judge nor these consolidated appeals were authorized by *Ta.L.* under the circumstances of this case (i.e., a change from adoption as one of the concurrent permanency goals to adoption as the sole permanency goal).   For the reasons set out below, we affirm the judgment of the Superior Court retaining the sole goal of adoption as the children's permanency goal.

**I.**

On August 19, 2015, after receiving a hotline referral, a District of Columbia Child and Family Services Agency (the "agency" or "CFSA") social worker found the Mother and the children, who at the time were ages three and eleven months, respectively, living in the Atlas Glass factory on Kenilworth Avenue, N.E., where there were open blades and speckles of glass on the floor, no furniture, and a temperature of almost 100 degrees. The agency arranged for emergency housing for the family at a hotel.

On August 24, 2015, a social worker visited the family at the hotel and observed that D.M. had two black eyes as well as other visible injuries. The children were then transported to a hospital where they were examined by a physician. The physician found that the children did not have good hygiene; that J.M. had a scar on his ankle that was consistent with a burn mark, and had more than ten skin markings about the size of finger tips on his trunk, back, arms, and legs, most likely caused by J.M.'s having been "grabbed too hard"; and that D.M. had a bruise on each eye, lacerations on her legs, a marking on her thigh that looked like a healed scar from a burn, and swelling on her frontal scalp caused by a recent head trauma. D.M. told a CFSA social worker that the Mother had hit her.

In an initial hearing on August 27, 2015, the magistrate judge ordered that the children be placed in shelter care. After a hearing on November 9, 2015, the children were adjudicated neglected and were committed to the custody, care, and control of CFSA. The magistrate judge established concurrent goals of reunification with the Mother and adoption and stated that "[i]n order for the children to safely return home[,] the [M]other must demonstrate the capacity to keep the children safe through successful and consistent visitation." The Mother had a history of mental illness; according to the parties' briefs, she had been diagnosed with bipolar disorder and schizophrenia. The magistrate judge noted that the agency had made a referral for the Mother to undergo a mental health evaluation. On February 24, 2016, the magistrate judge found that the Mother had yet to complete a mental health assessment and parenting classes, had not visited with the children on a regular basis, and for two months had not had contact with the agency. The magistrate judge retained the concurrent goals of reunification and adoption, but ordered a mental health evaluation. On June 30, 2016, the magistrate judge found that the Mother had completed the mental health assessment but "ha[d] refused the recommended services from the evaluation."

On October 12, 2016 — two months before this court issued its en banc opinion in *Ta.L.* — the court held a permanency hearing and at the conclusion changed the children's permanency goal from reunification concurrent with adoption to adoption only. The order changing the permanency goal stated the following rationale:

> The [M]other has not engaged with therapeutic services as recommended. She has not demonstrated an ability to safely parent the [children] by moving towards unsupervised visits. To date, the [M]other remains noncompliant with services and her contact with the agency has been minimal to non-existent. She visited only once with the [children] since July 2016. [She] resists engaging in therapy and/or signing release of information to allow the social worker to communicate with service providers.

Thus, as the magistrate judge later summarized, he made the October 2016 permanency-goal change upon a determination that the Mother "had failed to engage in recommended services and attend visits with the [children] consistently."

On March 17, 2017, the magistrate judge granted the Mother's request for an evidentiary hearing on the permanency-goal change pursuant to *Ta.L.* The court ordered that the evidence at the hearing would pertain to the time period from the

inception of the case until October 12, 2016, when the permanency goal was changed.[1] The Mother does not challenge that ruling in these appeals.

The magistrate judge presided over a two-day hearing on May 22 and July 6, 2017. The court heard testimony from Stephanie Gittinger, the social worker who was assigned to the case in August of 2015; from Lucy Aderibigbe, the social worker assigned to the case starting at the end of February 2016; and from Julius Ngole (the only witness called by the Mother), who identified himself as a community support worker with a service agency known as MBI. Mr. Ngole testified that his role was to "[e]ducate [the Mother] about her services, encourage [the Mother] to engage in receiving the mental health services," and "[m]ak[e] sure that [the Mother was] in compliance with what is required of her." Although the *Ta.L.* hearing was the Mother's opportunity to "testify, under oath concerning any alleged failure on the District's part to provide the requisite services and resources" and to testify about her "own efforts to meet the goals set forth in the plan that was developed to promote reunification," *Ta.L.*, 149 A.3d at 1079, the Mother was not

---

[1] In denying a motion for reconsideration of this ruling, the magistrate judge reasoned that "although the [c]ourt can envision circumstances in which evidence from the period after the permanency goal change may be relevant to clarify or provide context for the period before, [the Mother] does not suggest that such is the case here."

present for any portion of the proceedings on May 22 and did not testify during the hearing.

Following the hearing, the magistrate judge affirmed the permanency-goal change to adoption in an order dated July 18, 2017. The magistrate judge first determined that the "[g]overnment [had] provided the parents with an appropriate and reasonable plan for achieving reunification." *See id.* at 1078. The magistrate judge cited "the circumstances of removal"[2] (i.e., the Mother's "history of mental health issues," "allegations of physical abuse," and "the family's lack of appropriate housing") and Ms. Gittinger's "in depth" explanation of the "agency's rationale for each of its plan requirements" (including that "all three of [the Mother's] older children had been removed from her care due to allegations of neglect that stemmed, at least in part, from her mental health issues"). The magistrate judge observed that "the agency case plan focused on improving [the Mother's] mental health, coping skills, and daily parenting behavior," maintaining

---

[2]  The magistrate judge relied on the findings of fact in the February 19, 2016, neglect order. The Mother asserts "that it was improper for the [m]agistrate [j]udge to take judicial notice of the . . . [n]eglect [f]indings." This court has said, however, that "it is generally proper for a court to take notice of factual findings made in a prior related proceeding[.]" *In re P.D.J.K.*, 182 A.3d 1234, 1238 (D.C. 2018); *see also In re J.M.C.*, 741 A.2d 418, 424 (D.C. 1999) ("[T]he trial court at least may take judicial notice of prior neglect proceedings for the purpose of providing related and relevant background information[.]").

the parent-child bond, and on the Mother's securing safe and appropriate housing. Finding that the case-plan requirements were "narrowly tailored to help [the Mother] remedy the circumstances that led to the [children's] removal" and to help her "parent the children on her own safely," the magistrate judge concluded that the agency's plan for reunification was "reasonable and appropriate."

The magistrate judge next found that the government had "expended reasonable efforts to reunify the family." More specifically, the magistrate judge found that the agency had "made reasonable efforts to communicate the requirements of the plan" to the Mother (in that, at every visit, both Ms. Gittinger and Ms. Aderibigbe "spoke with [the Mother] about the plan requirements and the importance of complying with services"). The magistrate judge also found that the agency had "made reasonable efforts to assist [the Mother] in achieving the goals of the plan." The magistrate judge noted that social workers referred the mother to MBI for individual therapy and mental health services, made referrals to MBI's housing program and CFSA's parent advocacy program for parenting classes, encouraged the Mother to participate in anger management and parenting skills classes, ensured that visits with the children were scheduled at times and locations most convenient for the Mother, "reach[ed] out . . . by phone, text, as well as through family" when the Mother failed to attend visits with the children, and

provided transportation and accompanied the Mother to assist her to obtain housing.

Further, the magistrate judge found that the Mother "failed to make adequate progress toward satisfying the requirements of the case plan to achieve the goal of reunification." The court found that while the Mother "completed a mental health evaluation . . . , she failed to engage in any of the recommended services including individual therapy, parenting skills classes, and anger management classes." The magistrate judge noted that Mr. Ngole (who testified that the Mother participated in a mental health day program "akin to group therapy" "[s]ometime in 2015") was "unable to . . . describe her level of compliance with individual therapy prior to the . . . goal change" or to say "if [the Mother] had participated in individual therapy at all prior to the goal change." The court also found that the Mother "stopped attending visits altogether in July and August 2016," that the agency's multiple attempts to contact the Mother during that period were unsuccessful, and that the Mother had attended only a single visit with the children in September 2016.

Finally, the magistrate judge found that the agency had adequately explored vehicles for avoiding pursuit of termination of parental rights, specifically, kinship

placements.  The court noted that the agency had been unable to pursue one of the children's maternal aunts as a placement resource because the aunt "never followed up on the agency's referral [for assistance with finding the larger housing she would need to accommodate the children] or obtained larger housing."  The magistrate judge found that the Mother "did not provide the agency information about any other maternal relatives who may be willing to care for the children."

Upon the Mother's motion for review of the magistrate judge's ruling, the reviewing associate judge affirmed the permanency-goal change to adoption.  These appeals followed.[3]

---

[3]  K.L., the biological father of J.M., has submitted a statement in lieu of brief asserting that he "supports the positions and arguments stated in [the Mother's] brief."  Prior to the permanency-goal change, the agency was unable to contact K.L., who, the magistrate judge found, was incarcerated at St. Elizabeths Hospital (for competency testing in connection with murder charges) "throughout the life of this case."  The agency advised the court in a September 26, 2016, permanency review report that in light of K.L.'s apparent mental instability, it was unlikely that reunification with him could occur.

D.W. is the putative father of D.M.  The magistrate judge found that the Mother was unable to provide contact information for D.W. and that his whereabouts remained unknown at the time of the hearing and beyond.  The magistrate judge further found that the "agency's inability to develop a plan for reunification with [D.W. and K.L.] was reasonable and appropriate under the circumstances" and that the agency's "failure to make efforts to achieve reunification with the fathers" likewise was reasonable.

## II.

We begin our analysis with consideration of two preliminary matters. First, the District and the GAL argue that the magistrate judge had no authority to reconsider a change in permanency goal it made many months before the Mother's request for an evidentiary hearing, and before this court's decision in *Ta.L.* We must reject that argument because a division of this court decided otherwise in *In re Sa.C.*, 178 A.3d 460 (D.C. 2018). *See id.* at 461 (applying the "firm rule of retroactivity" and holding that because "the initial adverse change in the [child's] permanency goal from reunification to adoption [had] not become final" when *Ta.L.* was issued (in that the child's "neglect case was still being litigated in the trial court" at the time), "the trial court properly sought to follow *In re Ta.L.*" (internal quotation marks omitted)).

Second, the GAL contends that "an appellate court does not have jurisdiction to review a trial judge's decision that only retains a previously ordered permanency goal of adoption."[4] The GAL has correctly perceived that this court's

---

[4] *Cf. State v. Christopher G.*, Nos. A-12-945 through A-12-947, 2013 Neb. App. LEXIS 137, at *17 (July 30, 2013) ("Since the sole change in the August 2012 order was the change in the permanency objective from reunification and adoption to adoption only, with no other changes, the order merely continued a

(continued…)

*en banc* opinion in *Ta.L.* did not specifically authorize immediate appeals when the Superior Court changes the permanency goal from adoption and reunification as concurrent goals to adoption as the sole permanency goal. That said, we discern in the majority opinion in *Ta.L.* an intent to afford an evidentiary hearing and an immediate appeal whenever there is a permanency-goal change resulting in a sole goal of adoption. While acknowledging that the trial court may establish "concurrent goals of reunification and adoption," the en banc majority envisioned that a *Ta.L.* hearing will "enable parents to present any other evidence that they believe supports a decision *to continue with reunification efforts*" and that will avoid "a permanency goal decision that might lead to a situation that destroys family bonds." 143 A.3d at 1079 (emphasis added).

We recognize that in the instant case, even with the permanency-goal change from the concurrent goals of reunification and adoption, to adoption as the sole goal, the trial court has ordered a continuation of reunification-type efforts. For example, in the October 2016 order that changed the permanency goal, the court continued to order supervised visitation between the Mother and the children and unsupervised visitation "at the discretion of the social worker and GAL," and

_____

(…continued)
previous determination and did not affect a substantial right of [the biological father]. As such, the order appealed from was not a final, appealable order.").

stated that "[b]oth the [M]other and the [a]gency are expected to take reasonable steps . . . to ensure that the visits take place." Likewise, the May 17, 2018, Permanency Hearing Order provides for supervised visitation between the Mother and the children, with unsupervised visits at the discretion of the social worker and GAL. We also note that if, as the Mother asks, the change in permanency goal in issue here is reversed, the result would be reinstatement of the goal of adoption as one of the concurrent goals. Nevertheless, because the change from concurrent goals of reunification and adoption to a sole goal of adoption presumably has "allow[ed] the District to divert . . . resources from reunification to adoption," *id.*, we conclude that the holding of *Ta.L.*, allowing an immediate appeal of a permanency-goal change to adoption, applies in the circumstances of this case.

## III.

Our task in this matter is to determine "whether the trial court . . . made the requisite findings to justify a goal change and whether [the court's] findings were adequately supported by the record." *Id.* at 1080. "While procedurally this appeal is from the associate judge's order," we must "'look to the findings and conclusions of the fact finder [the magistrate judge] on which that ruling is

based.'" *In re J.O.*, 176 A.3d 144, 153 (D.C. 2018) (quoting *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012)).

To establish that a permanency-goal change to adoption was warranted, the District "must prove by a preponderance of the evidence that [(1)] it has provided the parents with a reasonable plan for achieving reunification, that [(2)] it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and that [(3)] the parents have failed to make adequate progress towards satisfying the requirements of that plan." *Ta.L.*, 149 A.3d at 1078. In addition, the District must show that "other vehicles for avoiding the pursuit of termination, e.g., kinship placements . . . have been adequately explored." *Id.* at 1079.

## IV.

### A.

The Mother's brief on appeal first takes issue with the agency's case plan for achieving reunification. The Mother does not challenge the trial court's finding that the case plan (set out in a February 2016 document and an August 2016

update) was tailored to help her remedy the circumstances that led to the children's removal. Rather, she contends that the plan was not "appropriate and reasonable" because she did not sign the plan documents and because the August 2016 plan document did not assign responsibility to the agency for any of the action components.

We have little trouble concluding that those omissions did not render the case plan for achieving reunification unreasonable or inadequate. As described above, the magistrate judge had directed, in its November 9, 2015, Disposition Hearing Order, that "[i]n order for the children to safely return home[,] the [M]other must demonstrate the capacity to keep the children safe through successful and consistent visitation." The magistrate judge also ordered the Mother to participate in a mental health evaluation and "follow through with any recommendations." The case plan in turn called for the Mother to "complete the court-ordered mental health evaluation and comply with all of the recommendations," to "complete[] an appropriate parenting course" and "attend her therapy sessions regularly" (actions that were recommended in the mental health evaluation), and to "improve her attendance at visits with the children." Thus, the case plan mirrored what the magistrate judge had ordered; it did not set out requirements that became effective only upon the Mother's signature. Further,

the February 2016 plan acknowledged the social worker's responsibility to make appropriate referrals for services and housing, to schedule and supervise visits between the Mother and the children, and to maintain contact with the Mother's and D.M.'s therapists.

The August 2016 case plan document (which Ms. Aderibigbe explained was prepared at a time when the Mother was not in contact with the agency, which therefore was unable to obtain her signature) was an update that spelled out in detail action items the Mother was to achieve (e.g., that the Mother would "exhibit age-appropriate redirection and discipline techniques" with the children, and would "not exhibit verbal aggression 80 percent of the time while interacting with the social worker"). It is true that the August 2016 plan document did not assign new responsibilities to the agency, but neither did it remove the agency's responsibility for the efforts described in the February 2016 document. We further note that the magistrate judge's ruling that the Mother had failed to make adequate progress toward reunification was not based on any of the detailed "action components" spelled out in the August 2016 document.

**B.**

The Mother next argues that the District did not prove that it "expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected." *Ta.L.*, 149 A.3d at 1078; *see also* D.C. Code § 4-1301.09a (2012 Repl.). In particular, the Mother argues that the agency failed to assist her with "[o]ne of the primary barriers to reunification" — her "mental health" — in that it "failed to obtain necessary documentation from [her] mental health provider, MBI."[5]

We focus our analysis on what Ms. Aderibigbe did, as she was the social worker during the eight months before the court changed the permanency goal.[6] Ms. Aderibigbe explained that she was never able to confirm with a mental health provider whether the Mother was receiving therapy because the Mother repeatedly refused to consent to a release of information (and also did not tell Ms. Aderibigbe

---

[5] The Mother asserts that documentation from MBI would have shown her compliance with the recommended mental health services, but the testimony of her own witness (Mr. Ngole) at the *Ta.L.* hearing belies that claim.

[6] This was not "too short of a period for social workers to work towards reunification." *In re A.B.*, 955 A.2d 161, 163 n.1 (D.C. 2008).

that she had signed a release when Ms. Gittinger was the assigned social worker).[7] The Mother did not dispute this testimony. In light of it, and although we question why Ms. Aderibigbe was not made aware of the release the Mother had signed for Ms. Gittinger,[8] we cannot conclude that Ms. Aderibigbe's failure to contact an MBI mental health provider amounted to a lack of reasonable efforts on the agency's part.[9] *Cf. In re Lake*, No. 282036, 2008 Mich. App. LEXIS 2130, at *3, *8-9 (Oct. 21, 2008) (rejecting the argument that the agency "failed to offer meaningful services to work toward reunification" where, *inter alia*, the mother's "unwilling[ness] to execute releases to allow . . . shar[ing of] information" with the agency "frustrated the reunification efforts and prevented her from benefiting from services").

The Mother also argues that it was not enough for the agency to refer the Mother for the recommended mental health services by giving her a list of service

---

[7] Ms. Aderibigbe testified that she "[n]ever bec[a]me aware that there had been a prior release signed by [the Mother] for the [a]gency."

[8] As the reviewing associate judge put it, "while the social worker bears some blame here, [the Mother] could easily have rectified this miscommunication."

[9] MBI community support worker Ngole testified that he spoke with Ms. Aderibigbe several times, but that the conversations were limited to her expressing appreciation for his support.

providers, leaving the Mother to obtain services on her own. We can agree that in some (perhaps most) circumstances the agency's handing the parent a referral list will fall short of reasonable efforts to assist with family reunification. Many parents involved with the system "do not recognize that they need assistance; they are not proactive. To the contrary, many are intimidated by 'the system,' lack good communication skills, and are unaware of how to proceed to help themselves. To state the obvious, that is why they need the agency's expertise and assistance." *In re James G.*, 943 A.2d 53, 81 n.24, 86 (Md. Ct. Spec. App. 2008) (concluding that the state's services "must adequately pertain to the impediments to reunification" and that a single referral to one employment program did not constitute reasonable efforts to assist a parent with obtaining employment).

In this case, however, the Mother had (as the agency was aware) a longstanding familiarity and relationship with MBI. The District's brief asserts, and the Mother does not dispute, that the Mother "became a MBI client in 2013," and Mr. Ngole testified that he first began working with the Mother in 2014. Thus, the social worker's referring the Mother to MBI for mental health services did not amount to leaving the Mother to obtain services on her own. Moreover, as the reviewing associate judge noted, Ms. Aderibigbe "actually [accompanied the Mother] to a mental health evaluation in April 2016."

The Mother finds fault in the agency's not having referred her to parenting classes and a housing program, as the case plan specified ("The social worker will refer [S.M.] to an appropriate parenting course" and "will refer [S.M.] to appropriate housing programs"), but having instead "referred [her] to the parent advocate program for parenting education resources and general support" and to MBI for housing assistance. However, the case plan did not require the social workers to make direct referrals to parenting and housing assistance programs, no law or precedent of which we are aware requires that, and it may well be that the agency's referral of a parent to other referral agencies is quite appropriate if those other agencies are most familiar with available resources.

In any event, Ms. Aderibigbe testified that the Mother presented to her undated documentation showing completion of a parenting and an anger management class (causing Ms. Aderibigbe to be concerned about whether the Mother had taken any classes recently, in connection with this case, and to direct the Mother several times to "get a certificate with the date on it"). There is no evidence that the Mother — who asserts in her brief that she "was able to successfully complete . . . parenting classes" — failed to document her attendance at parenting classes because the social worker had made only an indirect referral,

or that she failed to attend parenting and anger management classes because any classes identified by the parent advocate were in some regard inappropriate for the Mother's needs or situation. And, with regard to housing, it is undisputed that Ms. Aderibigbe helped the Mother obtain temporary housing through the Virginia Williams Center.[10] In short, this is not, as the Mother contends, a case in which the agency merely stood aside and assumed that other agencies were assisting the Mother.

The Mother's brief further faults Ms. Aderibigbe for not making a referral for the Mother to engage in family therapy, which the social worker testified was needed for reunification. However, Ms. Aderibigbe testified that D.M.'s play therapist, who was "open to working with the Mom[,] too," had indicated that a prerequisite to family therapy was individual therapy for the Mother, since it was "key for [the Mother] to be mentally stable herself" in order to begin engaging in family therapy.[11] Ms. Aderibigbe told the court that although she repeatedly ("at

---

[10] Ms. Aderibigbe testified without contradiction that she three times drove the Mother to the Virginia Williams Center and assisted the Mother with paperwork there, actions that ultimately led to the Mother's finding temporary housing.

[11] Ms. Aderibigbe explained that the Mother's "mental health instability was of major concern in her ability to maintain her mental health so that she can protect her children."

least eight to 10 times") spoke with the Mother about the importance of participating in the recommended mental health services, the Mother expressed that she was not engaging in therapy because "she didn't need it" and "there was no need for her to continue services." As to individual therapy, the Mother said that she had "been there, done that."

With regard to the individual-therapy requirement, we note that Ms. Gittinger testified that she repeatedly reminded the Mother that she needed to "find stable, safe and appropriate housing, . . . complete parenting classes, . . . complete a mental health evaluation and comply with any recommendations that were made therein, and . . . participate in and *complete individual therapy*."[12] (emphasis added). Also, the magistrate judge found that the Mother's psychological evaluation recommended that the Mother participate in individual therapy and parenting skills classes.[13] The Mother has not disputed that she was required to

---

[12] Ms. Gittinger testified that she stressed these requirements to the Mother both in court and either immediately before or after each visit with the children that Ms. Gittinger supervised (thus, approximately nine times over the span of Ms. Gittinger's involvement with the case).

[13] The Mother completed a psychiatric evaluation as well on March 23, 2016. The psychiatric evaluation does not specifically mention individual therapy as one of the recommended services, but does recommend "family therapy with her children," anger management classes, and parent counseling.

engage in individual therapy as a step toward reunification; indeed, Mr. Ngole testified that it was the Mother's counsel who informed him that "the [c]ourt [was] requir[ing] [the Mother] to do individual therapy."

We conclude that the record evidence supports the magistrate judge's finding that the agency expended reasonable efforts to help the Mother ameliorate the conditions that led to the children being adjudicated neglected.  As other courts have reasoned, the reasonable efforts standard does not "burden the agency with the additional responsibility of holding the hand of a recalcitrant parent," *In re Rosalie H*., 889 A.2d 199, 208 (R.I. 2006) (internal quotation marks omitted), and when a parent has refused to cooperate with the child welfare agency in its efforts to achieve reunification, that refusal to cooperate can be a consideration in support of a finding of reasonable efforts.  *See id.* at 209.[14]  We also agree with other courts

---

[14]  *See also In re Berger*, No. 317511, 2014 Mich. App. LEXIS 334, at *7 (Feb. 20, 2014) (holding that where the mother "failed to satisfy her commensurate responsibility to participate in the services that are offered," "the trial court did not clearly err by finding that petitioner made reasonable efforts at reunification" (internal quotation marks and ellipsis omitted)); *Lamar F. v. State*, Nos. S-11091 and 1156, 2004 Alas. LEXIS 7, at *19-20 (Jan. 14, 2004) ("[A] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts [toward reunification]." (internal quotation marks omitted)); *In re Amelia W*., 772 A.2d 619, 621-22 (Conn. App. Ct. 2001) (reasoning that the trial court's finding that the respondent was "unwilling to benefit from reunification efforts because he repeatedly told the worker that there was nothing wrong with him and that he did not need services"

(continued…)

that "the issue is not whether there was anything more that [the agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of this case." *E.g.*, *In re V.B.-S.*, No. 13AP-478, 2013-Ohio-5448, at *P47 (Ct. App. Dec. 12, 2013) (internal quotation marks and emphasis omitted). We are satisfied that they were.

## C.

The record also amply supports the trial court's finding that the Mother "failed to make adequate progress toward satisfying the requirements of the case plan to achieve the goal of reunification." To be sure, the Mother did complete a mental health evaluation; during some months, she appeared for most of the scheduled visits with the children; and, as the Mother's brief emphasizes, during some visits, Ms. Aderibigbe observed positive interactions between the Mother and the children, including positive interactions between the Mother and D.M., to whom the Mother had sometimes been inattentive during visits. However, the record evidence is that in the months before the permanency goal was changed, the

---

(…continued)
was sufficient to support a conclusion that the agency had satisfied the reasonable efforts requirement (internal quotation marks omitted)).

Mother refused to participate in individual therapy, and (per Mr. Ngole) she did not "switch from the group therapy to individual therapy" until March 2017, months after the permanency-goal change.[15] And, perhaps most important,[16] in the three months before the October 2016 permanency hearing, the Mother visited the children only once. Specifically, according to Ms. Aderibigbe's testimony, while the Mother had missed a few visits with the children in the period from March through June 2016, the Mother attended none of the scheduled visits with the

---

[15] Parts of the record are somewhat ambiguous regarding when the Mother began to receive individual therapy. Mr. Ngole testified that this occurred in March 2017, but Ms. Aderibigbe recalled speaking to Mr. Ngole in October 2016 in connection with the Mother's move to shelter housing and testified that her understanding from that conversation was that the Mother was "getting community support and individual therapy" from MBI. (Ms. Aderibigbe explained that the Mother gave her permission to speak with Mr. Ngole at that time because "he was being helpful in this situation.") However, the initial question from the Mother's counsel that prompted that response was about what services MBI was "offering" to the Mother, not about what services the Mother was actually receiving. Ms. Aderibigbe subsequently testified that she did not recall learning that someone was providing individual therapy to the Mother, and that she was never able to confirm that the Mother was engaging in individual therapy in the months before the permanency hearing. The magistrate judge found that the Mother "failed to participate in individual therapy," and we accept that factual finding because there is no "clear lack of evidentiary support" for it. *In re C.L.O.*, 41 A.3d at 510 (internal quotation marks omitted).

[16] We say this because the magistrate judge has said that adequate efforts by the Mother to visit the children is "the minimal expectation of her in order for the court to change the goal back to reunification," and we discern from his July 17, 2017, ruling affirming the change in permanency goal that the Mother's failure to visit the children consistently was a major reason for the change.

children in July or August and visited the children only once in September. This was despite Ms. Aderibigbe's efforts to reach the Mother through phone calls and text messages, reaching out to the mother's family, and visiting a home where a few previous supervised visits had taken place. The Mother's counsel noted at oral argument that the Mother was pregnant and gave birth sometime during this period (the record indicates that the child was born in early September 2016). But pregnancy in itself is not a disability,[17] and the Mother provided no evidence at the *Ta.L.* hearing that she was disabled or was otherwise prevented from visiting throughout July and August 2016 and in September 2016, and no evidence about why she failed to visit the children during those months. She also failed to maintain contact with the agency to explain her absence.

---

[17] *See, e.g.*, *Wadley v. Kiddie Acad. Int'l, Inc.*, Civ. No. 17-05745, 2018 U.S. Dist. LEXIS 101979, at *11 (E.D. Pa. June 19, 2018) ("Pregnancy alone is not a disability under the [Americans with Disabilities Act], though complications arising from pregnancy may constitute disabilities."); 81 Fed. Reg. 39108, 39134 n.155 (June 5, 2016) (citing EEOC Enforcement Guidance: Pregnancy Discrimination and Related Issues statement that "[a]lthough pregnancy . . . is never on its own a disability, some pregnant workers may have impairments related to their pregnancies that qualify as disabilities"); *Hawley v. Blackboard, Inc.*, Civ. No. 03-656 (GK), 2005 U.S. Dist. LEXIS 3865, at *30 (D.D.C. Mar. 3, 2005) ("[P]regnancy is not a disability under the [District of Columbia Human Rights Act].").

In explaining his finding about the Mother's failure to make adequate progress, the magistrate judge stated that the Mother's "behavior during visits continued to provide agency social workers with concerns regarding her ability to parent the respondents." The magistrate judge cited as an example the social workers' testimony that the Mother "focused much of her attention during visits on [J.M.]," "not pay[ing] attention to or try[ing] to engage with [D.M.]." The reviewing associate judge similarly highlighted the evidence of the Mother's "show[ing] a lack of emotional connection." Ms. Aderibigbe did testify to observing "a lack of emotional kind of connection" and absence of displays of affection between the Mother and the children, and Ms. Gittinger testified that the Mother "focused the majority of her attention on [J.M.]" and "had to be prompted to engage with" D.M. During cross-examination by the Mother's counsel, however, Ms. Aderibigbe acknowledged that her contemporaneous notes documented that the Mother was "attentive to the children" during an April 21, 2016, visit, during which she braided D.M.'s hair and did not show any anger or frustration toward the children, and that D.M. was "excited to see her mother that day." Ms. Aderibigbe's notes from a June 23, 2016, supervised visit similarly documented the social worker's observation that the Mother was "very attentive to her children." We mention this record evidence to say that if the magistrate judge's finding about the Mother's "behavior during visits" were supported solely

by the example the magistrate judge cited, we might have some difficulty upholding the court's finding. But that is not the case. Ms. Aderibigbe explained that one of the "biggest" "concerns [she] had with the [M]other" from speaking with her during a visit was that the Mother "still [was] not acknowledging the abuse" of the children. We therefore are satisfied that there was a sufficient record basis for the court to cite the Mother's behavior during visits as a basis for the lack-of-adequate-progress finding.

The magistrate judge further found that the Mother "failed to complete anger management and parenting skills classes as required." There was record support for that finding, given the Mother's failure to provide the social worker with a certificate showing a date of completion. But even if *arguendo* the Mother's undated certificate was sufficient evidence of her having completed the classes, the magistrate judge had an ample basis for his conclusion that the Mother otherwise "failed to engage in recommended services and attend visits with the [children] consistently."[18]

---

[18] The magistrate judge also found that the Mother "failed to participate in . . . medication management." Similarly, the reviewing associate judge cited as one of the bases for upholding the magistrate judge's ruling the lack of "evidence that [the Mother] was medication compliant." We note, however, that while the Mother's March 23, 2016, psychiatric evaluation recommended that she participate in anger management classes, family therapy, and parent counseling, it states that

(continued…)

**D.**

The Mother's last contention is that the agency "did not adequately explore maternal relatives as placement options for the [children]" or otherwise adequately "explore kinship placement options." We are satisfied, however, that the record supports the magistrate judge's contrary finding. Ms. Aderibigbe testified that the agency had identified, was working with, and had made housing referrals to the maternal aunt who had expressed her willingness to be a permanency provider to the children, but who did not have a large enough home to accommodate both the children and the children's three older siblings for whom she was already the permanency provider. The aunt had not found appropriate housing before the goal change, but the record shows that she "continued to express her intent to provide permanency" until early January 2017. Given the magistrate judge's unchallenged finding that the Mother did not provide the agency information about any other

---

(…continued)
"[s]ince [the Mother] did not . . . exhibit sufficient symptoms of any emotional disorder for which medication is indicated, none is being recommended at this time." In addition, an October 7, 2016, report from the children's GAL advised the court that the Mother had not been taking medication due to her pregnancy. We thus do not rely on medication compliance *vel non* as a basis for upholding the permanency-goal change.

maternal relatives who might be willing to care for the children, and given the agency's initial expectation of placing the children with the aunt, we cannot say that the agency's failure to identify other kinship placement options before the magistrate judge changed the permanency goal rendered the agency's efforts inadequate.[19]

**

For all the foregoing reasons, we discern no basis for disturbing the judgment of the Superior Court affirming the magistrate judge's post-*Ta.L.*-hearing ruling retaining, as the children's permanency goal, the sole goal of adoption set by the court in October 2016. Wherefore the judgment of the Superior Court is

*Affirmed.*

---

[19] The post-*Ta.L.* hearing shows that by January 2017, two additional family members (another maternal aunt and the children's maternal grandmother) had been identified as potential permanency options and were being assessed for appropriateness. The trial court record also shows that one of them filed, but later withdrew, a petition for adoption of the children.