*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-FS-1090

IN RE A.I.;
I.I., APPELLANT.

Appeal from the Superior Court of the
District of Columbia
(NEG-290-15)

(Hon. Julie Breslow, Magistrate Judge)
(Hon. Yvonne Williams, Associate Judge)

(Argued May 15, 2018                                    Decided July 11, 2019)

(Amended August 1, 2019)[*]

*Adriane R. Marblestein-Deare* for appellant.

*Rhondalyn Primes Okoroma*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Acting Deputy Solicitor General, were on the brief, for appellee District of Columbia.

*Lauren B. Schwartz*, guardian *ad litem*, was on the brief in support of appellee.

*Karen E. Dunkley* for the father, S.M., filed a statement in lieu of brief.

---

[*] This amended opinion reflects changes to page two and footnote four of this opinion.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and WASHINGTON, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: Before us is appellant I.I.'s interlocutory appeal of the trial court's decision to change the permanency goal from reunification to adoption of the minor child, A.I. On appeal, the birth mother I.I. challenges the trial court's determination that the criteria for a permanency goal change were satisfied. *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc). We affirm.

## I.      Factual and Procedural Background

On July 26, 2015, the mother, I.I., was involuntarily committed to Washington Hospital Center due to her symptoms and behavior resulting from her untreated mental illness. As a result of her involuntary commitment and a lack of an available caregiver, her then-five-year-old biological son, A.I., was placed into the custody of the Child and Family Services Agency ("CFSA"). Following a neglect hearing on October 20, 2015, A.I. was adjudicated a neglected child due to I.I.'s inability to care for A.I. based on her ongoing untreated mental illness. The trial court held a disposition hearing on October 29, 2015, set A.I.'s permanency goal of reunification with I.I., and ordered that reunification with A.I. was predicated on I.I. receiving mental health treatment for her diagnosed schizophrenia. However, after only four visits to the psychiatrist recommended by CFSA, I.I. ceased going. I.I. also refused

to pursue any additional mental health treatment or medication. I.I. denied having a mental illness to her psychiatrist, to the social workers, and to the court.

A.I. was in foster care from July 2015 until September 2016,[1] and the government petitioned the court to change A.I.'s permanency goal from reunification to adoption.[2] Consistent with this court's decision in *Ta.L.*,[3] the magistrate judge held an evidentiary hearing and determined that the government met its burden of showing by a preponderance of the evidence that a goal change to adoption was in the best interests of the child. *In re Ta.L.*, 149 A.3d at 1078-79. The

---

[1] While A.I. was in foster care, the trial court held two disposition review hearings on February 5, 2016 and June 13, 2016, discussed *infra*.

[2] By this time, the government was obligated to petition to move A.I. to permanency based on the District's policy of moving "children to permanency within timeframes set forth in the Federal Adoption and Safe Families Act" ("Federal ASFA"). *In re Ta.L.*, 149 A.3d at 1074 (citing the Adoption and Safe Families Act of 1997, Pub. L. No. 105–89, 111 Stat. 2115, 2128 (1997)). The Federal ASFA requires "a permanency hearing to be held . . . no later than 12 months after the date the child is considered to have entered foster care." 42 U.S.C. § 675(5)(C) (2018).

[3] This court issued *Ta.L.* in December 2016, three months after the magistrate judge initially granted the government's petition to change the permanency goal to adoption without a full evidentiary hearing. Following *Ta.L.*, the magistrate judge *sua sponte* held a four-day retroactive evidentiary hearing in April, May, and July 2017, on the permanency goal change pursuant to the opinion's requirements. The evidentiary hearing considered evidence from the start of the case until September 2016 when the goal was first changed. The magistrate judge upheld her previous decision to change the permanency goal to adoption.

magistrate judge's decision was affirmed on review by an associate judge of the Superior Court pursuant to Super. Ct. Fam. R. D(e).

The magistrate judge held a four-day *Ta.L.* evidentiary hearing on April 17, May 11, July 17, and July 19, 2017, after which she affirmed her initial decision to change the permanency goal from reunification to adoption. The magistrate judge heard the following evidence. In August 2015, shortly after A.I.'s removal, the court ordered I.I. to undergo a mental health evaluation. In October 2015, following A.I.'s neglect adjudication, CFSA prepared a written case plan and submitted the plan to the court. I.I. refused to participate in the case planning process despite repeated efforts by CFSA to engage I.I. The court thereafter considered CFSA's case plan and the record evidence, and ordered I.I. to "[c]omply with recommended mental health services at Family Matters, including attending therapy regularly and meeting with [the] psychiatrist regularly," regularly attend supervised visitation with A.I., and follow the social worker's direction at visits.[4]

---

[4] I.I. was not present at the October 29, 2015 Disposition Hearing, however, her attorney was present and attorneys, as officers of the court, are presumed to keep their clients informed of the case and requirements for a successful outcome. *See* D.C. Bar R. XI, § 1.3. I.I. does not contend that her attorney failed to fully inform her of the contents of the court's order.

Pursuant to the initial hearing order, I.I. met with Family Matters forensic psychiatrist, Dr. Bahram Panbehi, for the first time in late-September or early-October 2015, and then approximately three times thereafter. Dr. Panbehi diagnosed I.I. with schizophrenia, noting that I.I.'s paranoia was mostly directed at CFSA "for taking her kids away." Additionally, her paranoia was also directed at the court[5] and at germs, which led her to clean herself with abrasive and toxic household cleaning products such as hydrogen peroxide and bleach. Dr. Panbehi's reports contain allegations that she cleaned her children with household cleaning products and vaginal lubricant.[6] As part of I.I.'s treatment plan, Dr. Panbehi recommended "anti-psychotic medications" to treat her schizophrenia. Dr.

---

[5] For example, on May 17, 2016, I.I. emailed CFSA supervising coordinator Marla Belian threatening the magistrate judge and CFSA social worker Chanelle Reddrick: "Judge Breslow/ Dr.Kisling/ Chanel Reddrick ARE CRIMINAL. All I need is JUSTICE. and they will pay for damage they have done to me and my Family."

[6] Dr. Panbehi's diagnosis and assessment were consistent with I.I.'s history of mental illness that resulted in dangerous situations for herself and her children. In 2009, I.I. started a fire in her home because she wanted to see how quickly the fire department would respond. She was thereafter admitted to Saint Elizabeth's Hospital for three weeks and was diagnosed with bipolar disorder. In that same year, I.I. was also involuntarily committed to The Psychiatric Institute of Washington for two weeks. I.I. also admitted to being hospitalized at Georgetown University Hospital and at a hospital in Wisconsin, due to mental illness. The record contains allegations that I.I.'s mental illness not only affected her own physical well-being, resulting in rashes on her skin, but also the well-being of her children.

Panbehi's medical opinion was that until I.I. was on medication, she would remain a risk to herself and others. However, after only four visits with Dr. Panbehi, I.I. ceased attending therapy, and either ceased taking her prescribed medication or never began taking it.[7]

I.I.'s mistrust of CFSA contributed to the particularly poor relationship with the initially assigned social worker, Lauren DeAnna, who was assigned to the case in August 2015. I.I. requested that her attorney e-mail Ms. DeAnna instructing her not to contact I.I. I.I. also filed two civil lawsuits against Ms. DeAnna, which were dismissed. Ultimately, I.I. ceased all contact with CFSA by October 2015, when she also stopped attending regularly scheduled visits with A.I. I.I. reconnected with CFSA in February 2016 but still had sporadic periods of absence. Specifically, I.I. did not attend any visits with A.I. from November 13, 2015, until February 2, 2016, and for another month from February 3 to March 9, 2016. I.I. then attended three visits and stopped attending visits for another almost two months from April 6 to May 25, 2016. After I.I. reconnected with CFSA in February 2016, CFSA supervisors Elizabeth Bowman and Marla Belian were communicating with I.I.

---

[7] From the record, it is unclear whether I.I. actually took her prescribed medication. Dr. Panbehi reported that he saw I.I. on December 14, 2015, and she "agreed to a trial of anti-psychotic medication for treatment for her schizophrenia" but Dr. Panbehi was "not sure if she actually took the medicine."

directly in light of I.I.'s refusal to communicate with Ms. DeAnna. Additionally, family support worker, Rhonda Davis, handled supervised visits with A.I. Despite efforts and support from the team of CFSA social workers, I.I. remained mistrustful of CFSA's help and services, and visits with A.I. remained sporadic. For example, in May 2016, CFSA supervisor Ms. Belian asked I.I. to participate in a family team meeting with the newly appointed social worker who replaced Ms. DeAnna, Brittani Hawkins, and I.I. declined. I.I. responded with an e-mail, alleging that she did not have a mental illness, and that CFSA had "set [her] up." Because of her strong relationship with A.I., Ms. DeAnna initially continued to work with A.I. until May 2016, when she was replaced by social worker Brittani Hawkins and then by social worker Tamika Jones.

I.I. and social workers Ms. DeAnna and Ms. Jones testified at the *Ta.L.* hearing. The magistrate judge found both of the social workers to be knowledgeable and credible, and fully credited their testimony. The magistrate judge found I.I.'s testimony to be "rambling and unfocused and demonstrated a strange and persistent fixation on social worker Lauren DeAnna," and therefore, the magistrate judge did not assign I.I.'s testimony much weight. The magistrate judge found that I.I. was not adequately participating in mental health treatment nor consistently attending weekly supervised visitation with A.I., which in the magistrate judge's view

demonstrated that reunification was not feasible. The magistrate judge further noted that, "two years after the child's removal from his mother, [I.I.] still seemed to be thinking unclearly and still seemed to be demonstrating the same symptoms of mental illness she has demonstrated throughout the case."

Accordingly, the magistrate judge changed the permanency goal from reunification to adoption after she found, by a preponderance of the evidence, that the government had satisfied the three disputed factors set forth in this court's en banc decision in *Ta.L.*, finding that: (1) CFSA provided I.I. "with a reasonable plan for achieving reunification," (2) CFSA expended "reasonable efforts" to support I.I. in meeting the goals set out in the reunification plan, (3) I.I. "failed to make adequate progress toward satisfying the requirements of that plan," *In re Ta.L.*, 149 A.3d at 1078, and (4) CFSA "adequately explored" "other options for avoiding the termination of parental rights, including kinship placements," *In re K.C.*, 200 A.3d 1216, 1235 (D.C. 2019) (citing *In re Ta.L.*, 149 A.3d at 1078-79).[8] The magistrate judge found that adoption afforded A.I. the greatest level of stability and permanency, and was in his best interests. Regarding I.I.'s lack of progress toward achieving the goals required for reunification with A.I., the magistrate judge noted

---

[8] While we acknowledge the fourth factor as outlined by *In re K.C.*, 200 A.3d at 1235, we do not address this factor as it is not relevant to this appeal.

that "[t]he crux of the [] neglect matter is the incapacity of the parents." The magistrate judge explained that I.I.'s "incapacity was due to her untreated mental illness, which impaired her ability to parent A[.I.]" and that I.I.'s "need for mental health treatment was the single largest issue in this case."[9] On review, the associate judge affirmed the magistrate judge's decision to change the permanency goal in a written order. In her decision, the associate judge concluded that a primary focus of I.I.'s reunification plan for the duration of the case was treatment of her mental illness. Despite a written case plan identifying I.I. as in need of mental health treatment, access to treatment and encouragement to attend treatment by CFSA and the court, by the time of the permanency goal change hearing there was still "no evidence demonstrating that Ms. I[]'s mental health condition improved." This appeal followed.

---

[9] "It is well established that the fact that a parent has a mental or other illness does not make the parent unfit." *In re J.O.*, 176 A.3d 144, 154 (D.C. 2018) (internal citations omitted). The question for the court, however, is whether the mental illness "demonstrably interferes" with the parent's ability to care for the child. *Id*. (internal citations and quotation marks omitted).

## I.     Legal Standard

In this appeal, as we noted, I.I. challenges the trial court's determination that the criteria for a permanency goal change were satisfied. *In re Ta.L.*, 149 A.3d at 1078-79. We first review the legal framework for a permanency goal change.

The trial court has broad discretion when deciding permanency goal changes, and our review on appeal is limited to an abuse of discretion. *In re H.C.*, 187 A.3d 1254, 1264 (D.C. 2018) (citing *In re Ta.L.*, 149 A.3d at 1081). We review the trial court's legal conclusions *de novo*, and we defer to the trial court's factual findings unless they are clearly erroneous. *In re J.O.*, 176 A.3d at 153 (citing D.C. Code § 17-305(a) (2001)). While this is an appeal of the associate judge's order, we review "the findings and conclusions of the fact finder [the magistrate judge] on which that ruling is based." *Id.* (internal citation omitted).

In 1997, Congress enacted the Federal ASFA, which replaced the Adoption Assistance and Child Welfare Act of 1980 in response to "too many children [] languishing in foster care," with a focus on moving children "more quickly into permanent homes." *In re Ta.L.*, 149 A.3d at 1076 n.19 (citing H.R. Rep. No. 105–77, pt. 1, at 8); see *supra* note 2. In 2000, the District of Columbia amended its own

child welfare laws based on the Federal ASFA. The Adoption and Safe Families Amendment Act of 2000, D.C. Law 13-136 (2000) ("DC ASFA"). We therefore look to the federal statute, and its legislative history and implementing regulations, as well as the District's statutes and regulations, to understand the operative legal framework. *See Jenkins v. United States*, 80 A.3d 978, 991 (D.C. 2013).

We also look to our case law interpreting the District's ASFA. To change the permanency goal from reunification to adoption, the government bears the burden of showing by a preponderance of the evidence:

> [1] that it has provided the parents with a reasonable plan for achieving reunification, [2] that it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and [3] that the parents have failed to make adequate progress toward satisfying the requirements of that plan.

*In re Ta.L.*, 149 A.3d at 1078. If the trial court finds that the government has satisfied its burden, a change of permanency goal from reunification to adoption is "presumptively consistent with the requirement that we act in the best interest of the child." *Id*. It is I.I.'s challenge to the trial court's determination that the government had carried its burden under this multi-factor test that concerns us in this opinion.

We first consider the first factor, whether the government has proven that the case plan was reasonable. The federal law sets the standard requirements for a case plan for a child in the foster care system, the District of Columbia's law was created in the federal law's image, and the permanency planning policy illustrates how these statutory mandates manifest on a practical level. The District requires that CFSA "prepare a [case] plan for each child," D.C. Code § 4-1301.09(b) (2012 Repl.), which is defined as:

> [A] written . . . plan for assuring that the child receives safe and proper care and that services are available to the parents, child, and foster parents in order to improve conditions in the parents' home, [and] facilitate return of the child to his or her own safe home or to the child's permanent placement . . . .

D.C. Code § 4-1301.02(3) (2012 Repl.); *see* 29 DCMR § 4700 (establishing the standards under which CFSA and its subcontractors shall engage in case planning).[10] Under the DC ASFA, the case plan must be "a written" "plan for assuring that the child receives safe and proper care and that services are available to the parents,

---

[10] *See also* 29 DCMR § 4703.2(c) & (e) (outlining CFSA's case planning requirements); 29 DCMR § 4703.4 (requiring case planning reassessments "at least every six (6) months"); 29 DCMR § 4704.4 (requiring CFSA and its subcontractors to develop case plans that are "designed to promote the consistent, coordinated, and timely provision of care"); 29 DCMR § 4704.5 (requiring CFSA and its subcontractors to update the case plan "every six (6) months" and to "document the updates to the case plan in the client's record").

child, and foster parents in order to improve conditions in the parents' home."  DC

ASFA, Title II, § 201 (codified at D.C. Code § 4-1301.02(3)(B)).  Similarly, under

42 U.S.C. § 675(1) (2018):

> The term 'case plan' means a written document which meets the requirements of section 675a of this title and includes [inter alia] . . . [a] plan for assuring . . . services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care . . . .

Federal regulation also requires a case plan to:

> (1) Be a written document, . . . which is developed jointly with the parent(s) or guardian of the child in foster care; and (2) Be developed within a reasonable period, . . . after the child's removal from the home []; (3) Include a discussion of how the case plan is designed to achieve a safe placement for the child in the least restrictive (most family-like) setting available . . . and a discussion of how the placement is consistent with the best interests and special needs of the child []; (4) Include a description of the services offered and provided to prevent removal of the child from the home and to reunify the family; and (5) Document the steps to finalize placement when the case plan goal is or becomes adoption[.]

45 C.F.R. § 1356.21(g) (2001).

Likewise, CFSA requires that all case plans be:

a. Written in plain, every day language and understood by the child and family members.
b. Signed by the parent and the child (all children age 14 and above and younger children as appropriate).
c. Approved and signed by the social worker's supervisor.
d. Documented in [CFSA's internal database] upon initial completion and updated as needed.
e. Distributed to the parent, resource parent, guardian *ad litem* (GAL), the Court, and both Agency and contracted agency staff.

Child and Family Services Agency, *Permanency Planning Policy* § VII.A (2011), https://cfsa.dc.gov/publication/program-permanency-planning.[11] The requirement clarified in the federal regulations as well as CFSA's internal policy guide is that permanency planning should be a collaborative effort between CFSA and the parents. However, this requirement, which serves partially as a shield to the parent in preservation of their rights, may not also be used as a sword, particularly where the parent is unwilling to cooperate. This court has had occasion to review other cases where a parent has been unwilling to cooperate with CFSA in satisfying the requirements of a case plan. For example, in *In re J.M.*, the mother argued that the plan was not "appropriate and reasonable" because she did not sign the case plans. 193 A.3d 773, 782 (D.C. 2018). We held that the case plan was appropriate and reasonable, notwithstanding the mother's failure to participate in case planning and

---

[11] While CFSA's policy manual is not binding on the court, it reflects CFSA's understanding of its statutory obligations and its public commitment as to how to fulfill those obligations.

sign the case plans. *Id.* Our conclusion was based on the fact that the case plans were consistent with the law and with what the magistrate judge ordered the mother to do to achieve reunification throughout the case. *Id.* *J.M.* makes clear that, if a parent is given meaningful opportunities to participate in case planning, a parent's obstruction of the case planning process or decision not to sign the case plans will not prevent CFSA from proceeding with case planning without the parent. *Id.*

We next consider the second factor, which is whether "reasonable efforts" were made by CFSA. More specifically, we must consider what constitutes CFSA's duty to make "reasonable efforts" to reunite a parent with a child who has been removed from the parent's care. In *Ta.L.*, we stated the government must make "reasonable efforts" "to preserve and reunify families to make it possible for a child to safely return to the child's home." 149 A.3d at 1077 (internal citations and quotation marks omitted). CFSA must offer services designed to ameliorate the concerns that led to the neglect by the parent, because the child's return to the parent is presumptively in the child's best interests at this stage of the proceedings. *See id.* In passing the DC ASFA, the Council offered additional guidance regarding what constitutes "reasonable efforts" and stated that CFSA must expend "reasonable efforts" "to provide the necessary services for families of abused and neglected children to ameliorate the problem and, where possible, reunite children with their

family, and to devise a plan outlining the available services and the educational programs." DC ASFA. According to the legislative history of the Federal ASFA, Congress noted a nearly universal agreement among stakeholders that moving children in the foster care system more quickly toward permanency is preferable to allowing children to languish for lengthy periods in foster care.[12] However, state agencies must first make "reasonable efforts" to provide services to eliminate the barriers to reunify children in foster care with their birth parents. Therefore, Congress noted, state agencies must extend "some effort to offer services to the family," "[h]owever, the State retains the discretion to determine what services, if any, are appropriate, and of sufficient quality, intensity and duration in individual cases." H.R. REP. NO. 105–77, at 12; *see also* DC ASFA, Title I, § 101; 42 U.S.C.

---

[12] In an effort to move children more quickly into permanency, Congress made three significant changes, which are reflected in the Federal ASFA. First, Congress established stricter timelines for states to move toward terminating parental rights "under most circumstances" where the parent has not met the goals for reunification. H.R. REP. NO. 105–77, at 7; *see* 42 U.S.C. § 675. Second, Congress added an incentive payment to states for each adoption above the number of adoptions during the previous year. H.R. REP. NO. 105–77, at 7; *see* 42 U.S.C. § 673b. Third, Congress added an exception to the "reasonable efforts" requirement for when the government may discontinue its reasonable efforts in instances of "aggravated circumstances," e.g., "abandonment, torture, chronic abuse, and sexual abuse." H.R. REP. NO. 105–77, at 7; *see also* 42 U.S.C. § 671. This exception was added based on "a growing belief that Federal statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents" and, "[a]s a result, too many children are subjected to long spells of foster care or are returned to families that reabuse them." H.R. REP. NO. 105–77, at 8.

§ 678 (2012). In expending reasonable efforts, the government must devise a case plan tailored to the specific needs of each family, and encourage the parent to participate in services that will allow the parent to meet the goals of the case plan. *See* 42 U.S.C. § 671(a)(15)(A) (2018).

Aligned with applicable federal and state legislation and regulations, CFSA has interpreted its own duty to provide "reasonable efforts" to include providing, as necessary depending on each case, "the following individualized services for families:"

> a. Respite services
> b. Parenting skills, education, and/or counseling
> c. Mental health services (including day treatment)
> d. Substance abuse programs
> e. Housing assistance
> f. Day care assistance
> g. Intensive home-based services
> h. Intensive 14-day assessments
> i. Emergency cash assistance
> j. Access to other public benefits, including assistance
> with utilities
> k. Less intensive family services

*Permanency Planning Policy* §§ VII.B.2 (listing CFSA's in-home services) & VII.L.2.a (incorporating the aforementioned services into CFSA's list of out-of-

home services).[13] Our analysis of whether CFSA expended reasonable efforts is inherently linked to our analysis of what CFSA did to implement its own case plan, specifically CFSA's efforts to ensure the parent receives the services detailed in the required case plan. *In re J.M.*, 193 A.3d at 779 (affirming the trial court's determination that (1) CFSA's case plan was "reasonable and appropriate" based on its assessment that "the case-plan requirements were narrowly tailored to help [the Mother] remedy the circumstances that led to the [children's] removal and to help her parent the children on her own safely," and (2) the government had expended "reasonable efforts to [reunify the family by] communicat[ing] the requirements of the plan to the Mother" and making reasonable efforts to assist the Mother in achieving the goals of the plan.) (internal quotation marks omitted).

Each case is unique and therefore the reasonableness of CFSA's efforts depends on the specifics of each case. *Permanency Planning Policy* § VII.L (CFSA has recognized that each case plan must be tailored to meet "[t]he specific needs of the child and the family as they relate to the child's permanency goal."). CFSA has outlined that "[a]t the very least, the social worker shall make whatever arrangements are necessary to facilitate participation, including assistance with

---

[13] As we discussed *supra* note 11, while not binding on this court, we will accord some deference to CFSA's perspective on what services it must provide to satisfy "reasonable efforts."

transportation and child care services." *Id*. at §§ VII.C, VII.D, VII.F, VII.M.  In our view, the DC ASFA, like the Federal ASFA upon which it was based, seeks to balance two competing goals: (1) the District's obligation to provide the necessary services to eliminate barriers to reunifying children with their parents; and (2) the need to move children toward permanency while being mindful that children do not languish for lengthy periods in foster care in limbo and uncertainty because ultimately permanency is in the child's best interest.  Under the DC ASFA, "reasonable efforts" may vary from case to case.  However, in each case, "reasonable efforts" requires the District to identify the barriers to reunification and prepare a case plan by recommending appropriate services designed to address the needs of each child and family.  In order to satisfy "reasonable efforts" required under District of Columbia law, CFSA must refer the parent(s) to appropriate service providers who can assist them in ameliorating the barriers to reunification.  For example, in a case where lack of housing, mental illness, or drug addiction are barriers to reunification identified in the case plan, CFSA must identify services and make proper referrals to address the issues.  Further, "reasonable efforts" requires CFSA to actively encourage, facilitate, and support the parent(s) in accessing and taking advantage of the ameliorative services that are recommended in the case plan.  *See* DC ASFA; *Permanency Planning Policy* §§ III & IV.  Where the government has identified the barriers, made service provider referrals, and has actively encouraged

and facilitated attendance in good faith, the efforts will be deemed reasonable. *See* DC ASFA.

"Reasonable efforts" is determined by an examination of the agency's efforts, not the parent's compliance. It is not uncommon in neglect cases for there to be animosity between the parent, who has had a child removed from his or her care, and the agency that removed the child. The government's reasonable efforts will not be negated solely because the parent refuses to engage with the services provided by CFSA. For example, in *K.C.*, we held that CFSA's efforts to help the mother obtain mental health services were reasonable despite the parent's "refus[al] to meaningfully engage with [CFSA] staff or service providers with respect to her mental health." 200 A.3d at 1238. Likewise, in *J.M.*, we held that reasonable efforts were made where the social worker tried to stay in contact with the mental health provider to monitor the mother's progress but the biological mother "repeatedly refused to consent to a release of information." 193 A.3d at 783. Therefore, efforts will be considered reasonable where CFSA has made diligent efforts to encourage participation in the recommended services.

Our interpretation of "reasonable efforts" is consistent with other jurisdictions that have similarly defined "reasonable efforts" in neglect proceedings. For

example, the California Court of Appeals held that the record must show that the agency identified the problems that led to the child's initial removal, offered services to ameliorate those problems, maintained reasonable contact with the parent, and made reasonable efforts to assist the parent in taking advantage of the services offered. *In re K.C.*, 151 Cal. Rptr. 3d 161, 166 (Cal. Ct. App. 2012). While "reasonableness" is an objective standard, our analysis is fact-intensive and we assess what is reasonable depending on the specifics of each case. The agency drafts the case plans and offers services to the family based on the circumstances of the case and the needs of the family, and the reasonableness of the agency's efforts will be assessed by the court. *See, e.g.*, *Tracy J. v. Superior Court*, 136 Cal. Rptr. 3d 505, 513 (Cal. Ct. App. 2012) ("[T]he Agency's efforts are judged according to the circumstances of each case.") (internal citation and quotation marks omitted).

Finally, the third factor we assess when determining whether a permanency goal change was appropriate is whether the parent made adequate progress toward the reunification goals. We review the parent's progress toward the goals set out in the reunification plan and ordered by the court. However, where the parent has not made sufficient progress toward the reunification goals, it cannot be said that she has made adequate progress for the purposes of reunification. *See, e.g.*, *In re K.C.*, 200 A.3d at 1238 (Where the record reflects that the parent has not made "progress

that would be required for her to safely and effectively meet [the child's] needs," it cannot be said that the parent has made "adequate progress" towards reunification.). We now turn to the three *Ta.L.* factors as applied to this case.

## II.    Analysis

### A. The Government's Reunification Plan

I.I. first argues that the reunification plan "was not appropriate or reasonable" because she did not participate in the case planning process and did not sign the case plans.

The magistrate judge credited social worker Ms. DeAnna, who testified that she made numerous "efforts . . . to engage with mom" in case planning. The record reveals that the relevant criteria required by 45 C.F.R. § 1356.21(g), 42 U.S.C. § 675, D.C. Code § 4-1301.02(3), the DC ASFA, and CFSA's internal policy manual, were included in the reunification plan, and this further supports the magistrate judge's finding that the case plan was appropriate given the basis for A.I.'s removal. The case plan fulfilled DC ASFA's requirement that the case plan be "a written" "plan for assuring that the child receives safe and proper care and that services are

available to the parents, child, and foster parents in order to improve conditions in the parents' home." D.C. Code § 4-1301.02(3)(B). I.I.'s case plan is an extensive document that details, among other things, a "problem statement," a "vision of success," and "action components" for each domain in the case and for each participant in the case as well. For example, in the first case plan developed shortly after A.I.'s removal, under the domain of "Mental Health and Coping Skills," the "problem statement" stated that I.I.'s untreated mental health condition resulted in her hospitalization and A.I.'s removal from her care. The "vision of success" was that I.I. "will receive treatment for her mental health condition and show insight into the problems that" led to A.I.'s removal. Finally, the "action components" were that I.I. will meet with Family Matters for an intake assessment and will comply with treatment recommended by Family Matters psychiatrists, which may include therapy and medication. I.I.'s primary problem, as reflected by all of the case plans, was her untreated mental illness.

I.I.'s argument that she never participated in planning and did not sign the case plans is unpersuasive. CFSA tried to engage I.I. in case planning on numerous occasions, but I.I. refused to participate. In fact, I.I. admitted she was aware that Ms. DeAnna and CFSA attempted to reach out to her on numerous occasions to engage in reunification planning, but that she refused to work with, or even speak to

Ms. DeAnna, Ms. Hawkins, and the rest of the CFSA team assigned to work on the matter, and did not attend any case planning meetings. CFSA expended efforts to call, meet with, and reach out to I.I. Ms. DeAnna repeatedly encouraged I.I. to participate in therapy with Dr. Panbehi and attend visitation, and she facilitated I.I.'s access to these opportunities by providing referrals, transportation, follow-up, and outreach.

I.I. cannot defeat a permanency goal change by refusing to work with CFSA. I.I.'s refusal to participate does not render the case plan defective. It is undisputed that I.I. was informed of the case-plan contents and "had the opportunity to raise her concerns [regarding case planning or the reunification goals] in court" during the Disposition Hearing on October 29, 2015, and Reviews of the Disposition Hearings on February 5, 2016, and on June 13, 2016, but failed to do so.[14] In *J.M.*, we held that because "the case plan mirrored what the magistrate judge had ordered" in court

---

[14] Pursuant to D.C. Code § 16-2323(a)(1) (2012 Repl.), when a child has been adjudicated neglected and remains in an out-of-home placement, a review hearing must be held every six months until a permanency hearing is held. *See In re Ta.L.*, 149 A.3d at 1077. At review hearings, the court assesses and may amend the reunification plan to determine whether the child is safe and whether appropriate steps are being taken to address the child's needs and ameliorate the issues that led to the child being brought into the system. *Id.* The court conducted two review hearings on February 5 and June 13, 2016, both of which I.I. attended. After each hearing, the court issued an order determining that CFSA continued to make reasonable efforts toward the goal of reunification but that I.I. was not complying with the court's direction through the case plan.

and in the disposition hearing orders, the mother was notified of the case plan's requirements for reunification. 193 A.3d at 782. We specifically held that the requirements of the case plan did not need the mother's signature to be effective and therefore the mother's refusal to engage with CFSA, despite its efforts to involve her in case planning, would not prevent CFSA from proceeding with case planning without the mother. *Id.* The trial court here developed a case plan to address the primary barrier to I.I.'s reunification with A.I.—I.I.'s untreated mental illness. The trial court and CFSA repeatedly informed I.I. of her reunification goals throughout the duration of the case—to participate in mental health treatment and to consistently visit A.I. I.I. was also provided with a copy of the court's Disposition Hearing Order, which contained I.I.'s reunification goals prefaced with the following: "To achieve reunification, mother MUST do the following." See *supra* note 4. Accordingly, the trial court did not abuse its discretion in determining that the case plans were appropriate because they identified the barriers to reunification, set forth specific goals to address such barriers, and provided appropriate referrals for mental health treatment. I.I.'s refusal to engage with CFSA or participate in case planning does not render the case plan ineffective.

**B. The Government's Reasonable Efforts**

I.I. contends that CFSA did not expend reasonable efforts to assist her in reunification with her son A.I. The crux of I.I.'s argument is that her refusal to obtain mental health treatment and her failure to comply with the case plan was due to her poor relationship with one of the social workers, Ms. DeAnna. I.I. contends that to satisfy its duty of "reasonable efforts," CFSA should have done more. I.I. argues, for example, that CFSA should have removed Ms. DeAnna as her social worker sooner. I.I. argues that, but for the contentious relationship with CFSA social worker Ms. DeAnna, I.I. would have been able to fulfill the case plan and achieve reunification.

I.I.'s argument is unpersuasive and contrary to the record evidence in this case. The record reflects I.I.'s global mistrust of CFSA and her contentious relationship with several other CFSA social workers even after Ms. DeAnna was removed from the case. Ms. DeAnna was one member of a larger CFSA Family Support Team involved in the case, which included several social workers, supervisors, and family support workers. Ms. DeAnna was I.I.'s direct contact for only about two months during the entire case—from around September 2015, following I.I.'s involuntary commitment, until about October 2015 when I.I. ceased

communication with CFSA. The permanency goal was not changed until approximately one year later on September 12, 2016. Once I.I. reconnected with CFSA in February 2016, CFSA had already assigned family support worker, Rhonda Davis, to supervise visits, and Ms. DeAnna's supervisor, Marla Belian, had assumed direct contact with I.I. Ms. DeAnna remained on the case for A.I.'s benefit but had no direct contact with I.I.[15] Despite the changes that CFSA made by replacing Ms. DeAnna in her direct role with I.I., I.I.'s behavior did not change. I.I. did not reengage her visits with Dr. Panbehi; she continued to miss visits with A.I., from February 17 to June 1, 2016, and she failed to attend any visit in April 2016. During this time, Ms. DeAnna was completely removed from the case and replaced with

---

[15] With A.I.'s substantial health and behavioral challenges due to his mother's neglect, CFSA deemed it important that he have a healthy and consistent relationship with his social worker and therefore, CFSA's decision not to completely remove Ms. DeAnna from A.I.'s case is not inconsistent with the agency's requirement that "the child's safety and health shall be the paramount concern." D.C. Code § 4-1301.09a (2012 Repl.). Even after removal from I.I., A.I. had severe health and behavioral struggles in school and in his foster home. A.I. had difficulty engaging socially with his peers, often locked himself in the bathroom, threw daily temper tantrums, was physically aggressive with his peers (stabbed teachers and peers with pencils and threatened them with scissors), and threatened to kill himself and two of his classmates with scissors—A.I. held scissors to his own throat and said "I am going to kill myself." After a psychiatric evaluation, A.I. was diagnosed with "Reactive Attachment Disorder of Childhood, Impulse Disorder, Unspecified R/O Post Traumatic Stress Disorder, Chronic." A.I. attended weekly individual therapy, was prescribed medication to treat his aggression, and was put on an Individualized Education Plan at school. A.I. also has an eye condition and has to wear a patch and eyeglasses.

social worker Brittani Hawkins. I.I.'s claim that her lack of engagement and participation in her mental health treatment or participation in visits with A.I. was solely the result of the poor relationship with Ms. DeAnna is belied by the record.

I.I. also does not articulate what additional measures Ms. DeAnna or CFSA could have undertaken that would have demonstrated "reasonable efforts" other than a blanket statement that CFSA should have done "more."[16] CFSA provided I.I. with a mental health counseling referral to Dr. Panbehi and a transportation subsidy to get to visits with A.I. Additionally, because I.I. already had stable housing and a source of income, CFSA did not make referrals for housing or employment assistance. CFSA's team of social workers also attempted to reach out to and encourage I.I. However, I.I. rebuffed CFSA's efforts to communicate with her in any capacity.[17]

---

[16] At oral argument, the panel asked I.I.'s attorney numerous times what additional measures CFSA could have taken that would have constituted reasonable efforts; I.I.'s attorney could not provide an answer.

[17] I.I. was not committed to CFSA, nor was she under the custody and care of CFSA or the court and as such, I.I. retained her constitutional rights to refuse treatment. Therefore, CFSA did not have the authority to infringe upon I.I.'s liberty interests or force I.I. to attend therapy. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 228 (1990) (holding that a state prisoner has a liberty interest, under the Due Process clause of the Fourteenth Amendment to the United States Constitution, in refusing the administration of psychotropic medication). Compelling I.I. to participate in treatment, or exerting control over I.I. greater than the encouragement and facilitation that CFSA offered, would have infringed upon I.I.'s constitutional rights. "[E]very person has the right, under the common law and the Constitution, to accept or refuse medical treatment." *In re A.C.*, 573 A.2d 1235, 1247 (D.C. 1990).

The magistrate judge concluded that the social worker's efforts were unsuccessful not because they were inadequate, but because they "were completely thwarted by [I.I.]'s refusal to engage with the social worker." As the magistrate judge noted, "[n]o social worker can force a parent in a neglect matter to engage in treatment; all a social worker can do is ensure that the parent has access to treatment."

We hold that CFSA expended "reasonable efforts" to assist I.I. with reunification with A.I. I.I.'s mental health treatment remained the primary focus throughout the case, and her progress was reassessed approximately every six months. See *supra* note 14. The magistrate judge and CFSA identified I.I.'s primary focus for reunification, to obtain and engage in ongoing mental health treatment. I.I. was present at the review hearings in February and June 2016, and was reminded that her reunification with A.I. was contingent upon her obtaining consistent mental health treatment. For these reasons, the trial court did not abuse its discretion in determining "that [CFSA's] efforts constituted reasonable efforts to achieve reunification with the mother."

## C. I.I.'s Progress Toward Achieving Reunification

Lastly, I.I. argues that the trial court abused its discretion by finding that she did not make adequate progress toward her reunification goal. We disagree.

CFSA's case plan called for mental health treatment and visitation with A.I., and I.I. did not successfully complete either. The record indicates that I.I. failed to make progress on her goal of obtaining mental health treatment. Dr. Panbehi testified that after October 2015, he did not see I.I. regularly and, despite his efforts to maintain contact, he only saw her once in December 2015 and once in January 2016.[18] I.I. had access to treatment,[19] and was informed on numerous occasions by CFSA and in court during the disposition review hearings that she needed to attend treatment to be reunified with A.I., but the magistrate judge found that I.I. "simply chose not to avail herself of the mental health treatment." I.I.'s failure to participate in regular and ongoing mental health treatment coupled with her refusal to

---

[18] During those interactions, Dr. Panbehi stated that I.I. looked disheveled; I.I. admitted to Dr. Panbehi that she was cleansing herself with toxic chemicals again. Dr. Panbehi prescribed I.I. medication at that time but he was unsure if I.I. ever took it.

[19] Ms. DeAnna testified that she gave I.I. at least one SmarTrip metro card that she would reload with money to enable I.I. to attend visitation and treatment.

acknowledge that she had a mental illness at all, were critical factors in the magistrate judge's determination that I.I. failed to make sufficient progress toward meeting the goals for reunification.

The record shows further that I.I. did not regularly attend scheduled visitation with A.I.  I.I.'s attendance was inconsistent for the majority of the case prior to the permanency goal change, where she would go for long stretches of time without seeing A.I.[20]  Specifically, I.I. did not attend any visits with A.I. from November 13, 2015, until February 3, 2016, and for another month from February 3 to March 9, 2016.  I.I. then attended three visits and then stopped attending visits from April 6 to May 25, 2016.

I.I. also ceased communication with Ms. DeAnna after a supervised visit with A.I. on November 2, 2015.  I.I. refused to communicate with Ms. DeAnna even to confirm her attendance at visits with A.I.  Ms. DeAnna continued to call, text, and send letters and e-mails to I.I. but was informed by I.I.'s attorney that I.I. did not wish to communicate with Ms. DeAnna.  The trial court did not abuse its discretion

---

[20]  During the period that the trial court reviewed prior to changing the permanency goal, from September 10, 2015 to September 9, 2016, I.I. attended thirty-five out of fifty-seven scheduled visits with A.I.

in concluding that I.I. failed to make adequate progress toward the main barrier to reunification, her mental illness.[21]

### III.   Conclusion

The trial court did not abuse its discretion in finding that the government established, by a preponderance of the evidence, that its reunification plan was reasonable, that CFSA expended reasonable efforts to achieve reunification, and that I.I. failed to make adequate progress toward her reunification goals, in particular the goal of engaging in treatment for her mental illness. Because all three challenged *Ta.L.* factors were met, the law presumes a goal change is in the best interest of the child. Accordingly, the goal change from reunification to adoption is affirmed.

*So ordered.*

---

[21] Finally, I.I. takes issue with the time frame in which the magistrate judge considered evidence for the permanency goal change. I.I. argues that evidence from the neglect trial in October 2015, which included clinical testimony from Dr. Panbehi regarding I.I.'s mental illness, should not have been considered in the magistrate judge's decision. However, the trial court may consider all of the circumstances surrounding a child's removal when considering a permanency goal change. *See In re P.D.J.K.*, 182 A.3d 1234, 1238 (D.C. 2018); *In re M.V.H.*, 143 A.3d 94, 102 (D.C. 2016).