*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-FS-533

IN RE D.T.;
J.T., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(NEG253-16)

(Hon. Carol Ann Dalton, Reviewing Judge)
(Hon. Janet Albert, Trial Judge)

(Argued January 17, 2019                    Decided December 26, 2019)

*Kimberly Glassman* for appellant.

*Rhondalyn Primes Okoroma*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

*Robyn Thorpe*, guardian ad litem for appellee D.T., filed a statement in lieu of brief.

Before THOMPSON, BECKWITH, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* THOMPSON.

Dissenting opinion by *Associate Judge* MCLEESE at page 27.

THOMPSON, *Associate Judge*:    This appeal is brought by J.T., the birth mother of now eleven-year-old D.T., who was removed from J.T.'s home in 2016

and adjudicated neglected. A Superior Court magistrate judge (the Honorable Janet Albert) initially established reunification with J.T. as D.T.'s permanency goal, but, several months later, changed D.T.'s permanency goal to concurrent goals of reunification and guardianship, and thereafter to a sole goal of guardianship. After an evidentiary hearing (which the court and the parties referred to as a *Ta.L.* hearing[1]), the court subsequently changed D.T.'s permanency goal to adoption. This appeal by J.T. followed after the reviewing associate judge (the Honorable Carol Ann Dalton) affirmed that permanency-goal change.[2]

J.T. argues that the record did not permit the Superior Court to find by a preponderance of the evidence that the District of Columbia Child and Family Services Agency ("CFSA" or "the agency") established a reasonable case plan,

---

[1] *In re Ta.L.*, 149 A.3d 1060, 1075 (D.C. 2016) (en banc) (holding that "a trial court's grant of a [permanency-goal] change from reunification to adoption over the parents' objection, without an adjudicatory hearing to determine whether the District has fulfilled its duty to expend reasonable efforts to reunify the family, violates a parent's procedural due process rights").

[2] We note that on November 16, 2019, the trial court entered a decree of adoption of D.T. by his maternal grandfather, A.S. That order of adoption does not moot this appeal because J.T. has sought a review by an associate judge of the final order of adoption. *See In re D.B.*, 947 A.2d 443, 445 n.1 (D.C. 2008) (declining to dismiss as moot appeal from an order prohibiting the birth father from visiting his daughter even though a petition for adoption was subsequently granted, because the adoption decree was on appeal and thus was not yet final).

made reasonable efforts toward reunification of D.T. with J.T., and adequately explored kinship placement alternatives to adoption, or to find that J.T. failed to make adequate progress toward reunification.[3]  For its part, appellee District of Columbia ("the District") urges us to hold that the Superior Court's ruling was not a final, appealable decision and that we therefore lack jurisdiction over this appeal. The District further argues that even if this court has jurisdiction, J.T. has forfeited any claim that CFSA failed to provide adequate reunification services and that J.T.'s claims otherwise fail on the merits.

For the reasons that follow, we conclude that we have jurisdiction over this appeal.  We affirm the associate judge's ruling upholding the permanency-goal change to adoption.

---

[3]  There is something of a logical disconnect between J.T.'s argument that CFSA failed to make reasonable efforts toward her reunification with D.T. and her argument that guardianship (rather than reunification) is the appropriate permanency goal for D.T.  Nevertheless, we recognize that her reasonable-efforts argument is designed to displace adoption (and the termination of parental rights it entails) as D.T.'s permanency goal.

**I.**

D.T. was removed from J.T.'s custody on August 5, 2016, because of J.T.'s drug use (specifically, her "chronic use of PCP and marijuana," including while D.T. was in her care), her inadequate supervision of D.T., and her inappropriate conduct in disciplining D.T. (including using her unshod foot to "kick push[]" him in the face).[4] On September 9, 2016, J.T. stipulated that D.T. was neglected within the meaning of D.C. Code § 16-2301(9)(A)(ii), (iii) (2019 Supp.). The court committed D.T. to the custody of CFSA, set a goal of reunification with J.T., and ordered J.T. to undergo psychological and psychiatric evaluations (including an extended psychiatric evaluation by the Department of Behavioral Health ("DBH")), to comply with all recommendations from those evaluations, and to undergo regular drug testing. J.T. was allowed supervised visitation with D.T.

On April 6, 2017, the trial court added a concurrent goal of guardianship, reasoning that J.T. "had not engaged in the [mental health and substance abuse]

---

[4] D.T.'s father died in 2011.

services identified to achieve reunification." On August 16, 2017, over the District's objection that D.T.'s permanency goal should be changed to adoption, the court changed the goal from reunification to guardianship with Mr. S. At a permanency hearing on January 3, 2018, the District again asked the court to change the permanency goal to adoption.[5] On February 26, 2018, the court held an evidentiary hearing to determine whether to order that goal change. The court heard testimony from CFSA social worker Daniel Morris and from J.T.[6]

On February 27, 2018, Magistrate Judge Albert issued a "Goal Change Order" that changed the permanency goal to adoption. She found that the agency had provided J.T. with a reasonable plan to achieve the goal of reunification and expended reasonable efforts to help J.T. achieve reunification, but that J.T. had repeatedly tested positive for drugs or missed the required weekly drug testing, refused to participate in an Addiction Prevention and Recovery Administration

---

[5] Mr. S. filed an adoption petition on December 19, 2017. CFSA social worker Daniel Morris testified that Mr. S. has stated "consistently and very strongly that he will always be there for his grandchild and that he leaves it up to the agency to make a final determination of what the permanency goal would be [guardianship or adoption by Mr. S.], but whatever goal the agency determines[,] he is willing to go ahead with it."

[6] Both testified that J.T. and D.T. have a good relationship. Mr. Morris told the court that D.T. is "well bonded to his mother" and that she "has demonstrated that she really cares about him."

("APRA") assessment or drug treatment, rejected the agency's offers of assistance in arranging mental health services, lacked self-awareness about her drug addiction and mental health issues, was unable to complete the court-ordered extended mental health evaluations because of her lack of sobriety, refused to sign waivers to allow the agency to learn of her treatment plan and progress when she did begin to receive therapy, did not share with her therapist information about the neglect case, and had been unable to progress toward unsupervised visitation with D.T. because of her unaddressed mental health and substance abuse problems.

J.T. thereafter appealed Magistrate Judge Albert's decision. Associate Judge Carol Ann Dalton affirmed Magistrate Judge Albert's February 27, 2018, order.

## II.

This court has jurisdiction over all "final orders and judgments of the Superior Court of the District of Columbia[.]" D.C. Code § 11-721(a)(1) (2013 Repl.). We have said that "an order is usually not final unless it completely resolves the case." *In re K.M.T.*, 795 A.2d 688, 690 (D.C. 2002), *overruled on other grounds by Ta.L.*, 149 A.3d at 1076. "In the context of neglect proceedings

. . ., finality has generally been held to mean either a restoration of physical custody, a termination of parental rights, or an adoption." *Id.* at 690. "An order that is merely a step toward one of those acts is therefore not final and appealable." *Id.* In *Ta.L.*, however, this court overruled *K.M.T.* with regard to orders changing permanency goals from reunification to adoption. *Ta.L.*, 149 A.3d at 1075-76. We held that such orders are immediately appealable because they "effective[ly] sever[]" the parent-child relationship. *Id.* at 1075.

The District argues that we should dismiss this appeal for lack of jurisdiction because it does not challenge an order changing the child's permanency goal from reunification to adoption. Instead, the District emphasizes, J.T.'s appeal is from an order that changed D.T.'s permanency goal from guardianship to adoption. Thus, the District argues, this case does not "fit into the narrow exception for interlocutory review carved out in *Ta.L.*"

This court considered a similar argument in *In re J.M.*, 193 A.3d 773 (D.C. 2018), in which a mother sought review of a decision of the Superior Court that changed the permanency goal from concurrent goals of reunification and adoption, to a sole goal of adoption. *Id.* at 777. We concluded that "the holding of *Ta.L.*,

allowing an immediate appeal of a permanency-goal change to adoption, applie[d] in th[at] circumstance[] . . . ." *Id.* at 781. We explained that we "discern[ed] in the majority opinion in *Ta.L.* an intent to afford an evidentiary hearing and an immediate appeal whenever there is a permanency-goal change resulting in a sole goal of adoption[,]" so as to "enable parents to present any . . . evidence that they believe supports a decision to continue with reunification efforts" and to avoid "a permanency goal decision that might lead to a situation that destroys family bonds." *Id.* (quoting *Ta.L.*, 149 A.3d at 1079) (internal quotation marks and added emphasis omitted). At least the latter rationale is applicable here.[7] In addition, there is another reason why we conclude that we have jurisdiction. As more fully explained below, the Superior Court treated this matter, and the parties litigated it, as if the challenged ruling were an order changing D.T.'s permanency goal from reunification to adoption.[8]

---

[7] The former rationale is not applicable because J.T. seeks a return to the permanency goal of guardianship, not reunification with D.T.

[8] Indeed, the District now asserts that "[a]pplication of the *Ta.L.* factors at the February 2018 [goal-change] hearing impermissibly focused the inquiry on CFSA's reunification efforts . . . ."

During the evidentiary hearing, the District's questioning of social worker Morris focused on Mr. Morris's communications to J.T. about "what she needed to do to unify with the child," "what needed to happen to achieve reunification[,]" and the progress J.T. was making "towards reunification." Further, while Magistrate Judge Albert recognized that the matter was before her on the District's request to change D.T.'s goal of guardianship to a goal of adoption, she proceeded on an understanding that "[t]hroughout the life of a neglect matter, the [c]ourt is required to determine whether reasonable efforts have been made to achieve reunification with parents."[9] Consistent with that understanding, the Goal Change Order reasons that "[r]eunification is not viable when a parent is unable to have unsupervised contact with her child" and concludes that J.T. was "unable to make sufficient progress toward reunification[,]" that "there is insufficient reason to believe that [J.T.] is addressing the mental health barriers to reunification[,]" that J.T. "has failed to ameliorate [her drug-use] barrier to reunification[,]" and that J.T. "has made reunification an unattainable goal."[10]

---

[9] *But see, e.g.*, Super. Ct. Neg. R. 32(b) ("At the first permanency hearing and at a permanency hearing at least once every 12 months thereafter, there shall be a determination of whether reasonable efforts have been made to reunite the family *or to carry out the other permanency plan established for the child.*" (emphasis added)).

[10] And, of course, Magistrate Judge Albert had the authority to revisit her decision changing the permanency goal from reunification to guardianship. *Cf. In*

(continued…)

In seeking review by an associate judge of Magistrate Judge Albert's ruling, J.T. filed a motion entitled "Motion for Review of Magistrate Judge's Order Changing the Permanency Goal *from Reunification to Adoption*" (emphasis added). The brief in support of J.T.'s motion argued that CFSA failed to set up a reasonable plan to achieve reunification and failed to expend reasonable efforts to help J.T. achieve reunification, and asserted that J.T. "made adequate progress . . . to achieve the goal of reunification[.]" The District argued in its opposition (entitled "Memorandum of Points and Authorities in Support of the District of Columbia's Opposition to Motion for Review of Magistrate Judge's Order Changing the Goal From Reunification to Adoption") that CFSA provided J.T. with a reasonable plan to achieve reunification, that the agency made reasonable efforts "to support the mother in achieving reunification[,]" and that J.T. failed to make adequate progress toward achieving the goal of reunification. And far from

---

(…continued)
*re G.K.*, 993 A.2d 558, 560 (D.C. 2010) ("At the permanency review hearing . . . the trial judge set aside G.K.'s permanency goal of guardianship and changed his . . . permanency goal[] to reunification with [his] mother . . . who apparently had been 'making substantial steps toward reunification.'"); *see also In re Sa.C.*, 178 A.3d 460, 462 (D.C. 2018) (acknowledging that "[a]n order changing a permanency goal may become law of the case," but explaining that the "discretionary" law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided" and "is not a limit to [the trial court's] power" (internal quotation marks omitted)).

objecting to J.T.'s focus on the goal change from reunification to adoption, the District argued that review by the associate judge would be the forum to "assess[] the [a]gency's efforts in total to achieve the plan for reunification."

Reviewing Associate Judge Dalton identified the motion before her as a "Motion for Review of Magistrate Judge's Order Changing the Respondent's Permanency Goal from Reunification to Adoption[.]" Affirming Magistrate Judge Albert's ruling and rejecting J.T.'s contention that the magistrate judge abused her discretion by finding that the District "proved it made reasonable efforts towards reunification[,]" Judge Dalton found that the District provided a reasonable plan for reunification and expended reasonable efforts to reunify the family, but that J.T. failed to make adequate progress toward satisfying the plan.

On this record, we conclude that the issue of whether the record supported a goal change from reunification to adoption was "expressly or impliedly tried by consent of the parties[.]"[11] To state the point differently, by consent of the parties, Judge Dalton was asked to review whether Magistrate Judge Albert abused her

---

[11] *Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 269 (D.C. 1987) (internal quotation marks omitted).

discretion in ordering (in steps, over the course of several months) a change in D.T.'s permanency goal from reunification with J.T., to adoption. That having been the issue resolved by the Superior Court on the basis of the February 26, 2018, evidentiary hearing, we are satisfied that we have jurisdiction to hear this appeal, in which J.T. asserts that the criteria established by *Ta.L.* with respect to permanency-goal changes from reunification to adoption were not satisfied.[12]

We acknowledge the District's objection to what it calls J.T.'s "belated complaint about the decision to move away from reunification" to guardianship. The District asserts that the order that changed D.T.'s permanency goal to guardianship was sufficiently final to be appealed to an associate judge.[13] However, *Ta.L.* did not exempt goal changes from reunification to guardianship

---

[12] We also agree with J.T. that this is the correct result in order to further the public policy described in *Ta.L.* As J.T. implies, if the limited exception created by *Ta.L.* foreclosed our consideration of the net result of the first-step goal change from reunification to guardianship and the second-step goal change from guardianship to adoption, that could be an incentive for the agency to pursue goal changes in steps to avoid creating immediately appealable goal changes from reunification to adoption.

[13] See District Br. at 16 ("J.T. counters that if a goal change from guardianship to adoption is not immediately appealable, then the goal change that effectively abrogates a parent's rights can never be appealed. . . . But that is not true. A parent would simply need to appeal the initial goal change away from reunification and to guardianship.").

from the rule of *K.M.T.* that "an order is usually not final unless it completely resolves the case[,]" 795 A.2d at 690, and our case law does not otherwise establish that a goal change from reunification to guardianship is an immediately appealable order. Nevertheless, we can assume for the sake of our analysis that the goal change to guardianship was an immediately appealable order that J.T. failed to appeal within the time limit established by D.C. Fam. Ct. R. D(e) (generally requiring that a motion for review of a magistrate judge's order be filed within ten days, though permitting a twenty-day extension of that period upon a showing of excusable neglect).[14] Even though J.T. missed that appeal deadline, the District's objection now to Judge Dalton's consideration of J.T.'s challenge to the goal change away from reunification is foreclosed by the principle that "[a] party indisputably forfeits a timeliness objection based on a claim-processing rule if he raises the issue after the court has issued a merits decision." *Na.H.*, 65 A.3d at 116 (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1147 (D.C. Cir. 2007)) (internal quotation marks omitted). As described above, the District litigated this case at the *Ta.L.* hearing as if the goal change away from reunification was properly in issue,

---

[14] We see no reason why the D.C. Fam. Ct. R. D(e) time limit for filing an appeal should be treated as an unwaivable jurisdictional limit rather than a waivable claim-processing rule. *See In re Na.H.*, 65 A.3d 111, 116 (D.C. 2013) ("Unlike statutory deadlines that Congress intended to limit a court's jurisdiction, claim-processing rules are court-promulgated rules, adopted by the [c]ourt for the orderly transaction of its business." (brackets and internal quotation marks omitted)).

and we conclude that the District thereby forfeited any claim that J.T.'s challenge was not timely presented to the reviewing associate judge and thus is not properly before this court.

We therefore proceed to address the other issues the parties have raised.

**III.**

Our review is guided by *Ta.L.* We established in *Ta.L.* that, "absent waiver by the parent[,]" the trial court must ensure that a goal change to adoption is appropriate by, "at a minimum, making findings that (1) the District has expended reasonable efforts to reunify the family, (2) the goals set for the parent[] were appropriate and reasonable; and (3) other vehicles for avoiding the pursuit of termination, [such as] kinship placements, . . . have been adequately explored." *Ta.L.*, 149 A.3d at 1079. We explained that the government bears the burden of showing by a preponderance of the evidence that it "provided the parents with a reasonable plan for achieving reunification" but that the parent has "failed to make adequate progress towards satisfying the requirements of that plan." *Id.* at 1078.

This court's task is to review "whether the trial court has made the requisite findings to justify a goal change and whether those findings were adequately supported by the record." *Id.* at 1080. "[O]ur review on appeal is limited to [a review for] abuse of discretion." *In re A.I.*, 211 A.3d 1116, 1123 (D.C. 2019). "We review the trial court's legal conclusions *de novo*, and we defer to the trial court's factual findings unless they are clearly erroneous." *Id.* "While this is an appeal of the associate judge's order, we review the findings and conclusions of the fact finder" — i.e., the magistrate judge — "on which that ruling is based." *Id.* at 1123-24 (internal quotation marks omitted).

## IV.

We have little trouble upholding the Superior Court's conclusion that CFSA adequately explored vehicles for avoiding the pursuit of termination of J.T.'s parental rights, such as kinship placements, and that by the time of the goal-change hearing, J.T. had not made adequate progress toward reunification with D.T.

From the outset, CFSA looked to kinship placements for D.T. Initially, he was placed with his paternal great-grandmother and eventually with Mr. S., his

maternal grandfather.  D.T.'s placement with Mr. S. has given J.T. the opportunity not only to visit D.T. but also to participate with him and Mr. S. in activities such as going to the movies and to the park, bike riding, going out to eat, and visiting other family members, thus maintaining her bond with D.T.  Although J.T. criticized the agency for not supporting guardianship with Mr. S. as a permanent placement for D.T., the agency has complied with federal law by making "efforts . . . to discuss adoption by the child's relative foster parent as a more permanent alternative to legal guardianship . . . ."  42 U.S.C. § 675(1)(F)(v) (2018).

As to J.T.'s progress, J.T. does not dispute Magistrate Judge Albert's findings that she was ordered to undergo weekly drug testing but failed to test weekly during the year and a half before the goal-change hearing (from which the trial court permissibly drew a negative inference that "each test that was missed is a positive drug test") and that when she did test, she tested positive 17 times for PCP and 19 times for marijuana, including twice in 2018, despite the court's order that she refrain from using drugs.[15]  J.T. implied at the *Ta.L.* hearing that her use of marijuana, which she emphasized "is legal[,]" is a lifestyle choice.  She also

---

[15]    The agency's September 8, 2016, Disposition Report states that D.T. reported to the social worker that J.T. is "like a zombie" after she smokes PCP.

insisted that she could stop using PCP and marijuana at any time and denied having a substance abuse problem, but she failed to complete an APRA assessment as urged by CFSA and did not engage in any drug treatment programs.[16] As to mental health services, J.T. never had the comprehensive evaluation that was recommended by DBH because sobriety was a pre-condition for that assessment. J.T.'s lack of sobriety was also the reason why she never progressed to unsupervised visitation with D.T. Further, J.T. declined the CFSA social worker's offer to connect her with mental health services, saying that she could do so on her own, but then failed to do so until the month before the goal-change hearing, insisting that she did not need such health services. When J.T. began seeing a therapist, she did not give the therapist information about her neglect case, told the court that she discussed with the therapist whatever she wished, and did not execute a release to permit CFSA to monitor her progress in treatment. J.T.'s expressed view was that CFSA should "[m]ind [its] business" and leave her to "get it done at [her] own pace . . . ." On this record, we discern no basis for disturbing the trial court's lack-of-progress finding.

**V.**

---

[16] J.T. testified that she "didn't feel that there was a need for [her] to attend drug treatment . . . ."

The focus of our remaining analysis is on whether the record supports the Superior Court's finding that CFSA provided J.T. with a reasonable plan for achieving reunification and made reasonable efforts to help J.T. reunify with D.T. *See Ta.L.*, 149 A.3d at 1078, 1080.

We begin with the District's argument that J.T. "forfeited her right to contest the agency's reunification efforts" by failing to object to Magistrate Judge Albert's earlier reasonable-efforts findings. The District's argument correctly reflects that in the Initial Hearing Order and in disposition-hearing or permanency-hearing orders issued on August 5, 2016, September 9, 2016, December 14, 2016, April 6, 2017, and August 16, 2017, the trial court found, with no objection noted in the orders, that the agency had made reasonable efforts to achieve the goal of reunification. In the August 16, 2017, order — the order in which the court changed D.T.'s permanency goal from reunification concurrent with guardianship, to a sole goal of guardianship — the court specifically noted that there was "NO OBJECTION" to the court's finding that the agency had made reasonable efforts to achieve the concurrent goals of reunification and guardianship, which finding was premised in part on the agency's having encouraged J.T. to refrain from substance use and to participate in drug treatment and mental health services. Further, in the

parties' February 12, 2018, Joint Pretrial Statement for the evidentiary goal-change hearing, while the District set out its contention that the agency "expended reasonable efforts to help [J.T.] ameliorate the conditions of neglect[,]" J.T. countered only with a contention that she had "made adequate progress to reunify with her son" by "actively participat[ing] in [D.T.'s] education and mental health treatment"; she did not in that document contest the District's contention about the agency's reunification efforts.

In light of the record of J.T.'s repeated non-objections to the court's "reasonable efforts" findings described above, and especially given J.T.'s assertion that permanent guardianship rather than reunification is an appropriate permanency goal for D.T.,[17] we accept the District's argument that J.T. forfeited the issue of whether the agency made reasonable efforts to help J.T. achieve reunification, except insofar as the reasonable-efforts requirement entailed providing J.T. with a reasonable plan for achieving reunification.[18] Whether J.T. forfeited her no-reasonable-case-plan claim and whether the record permitted the Superior Court to

---

[17] We agree with the District that CFSA was under no obligation to provide reunification services during the period when D.T.'s goal was solely guardianship.

[18] *See A.I.*, 211 A.3d at 1127 ("'[R]easonable efforts' requires the District to . . . prepare a case plan . . . .").

find that the reasonable-case-plan requirement was satisfied requires some additional discussion and analysis.

We conclude that J.T. has not forfeited her reasonable-case-plan argument. Her counsel told the trial court that "reasonable case planning has not occurred[,]" and J.T. contends in her brief on appeal that the agency at no time filed a case plan with the court and "never made a reasonable plan for reunification." She points out that CFSA offered into evidence no formal case plans, either signed by her or unsigned, and that none were filed in the court jacket, even though federal law (42 U.S.C. § 675(1)) defines "case plan" as a "written document" with a "series of required elements" that are not satisfied by a court order. J.T. argues that the agency thereby failed to provide her notice of "clear goals and interventions[.]" She notes, as an example, that she was not ordered to complete any additional services other than those ordered at one of the initial hearings, and that there was neither a court order nor a written case plan mandating an APRA assessment. Therefore, she suggests, even if court orders could convey a case plan, and even if J.T.'s presence at the various court hearings gave her notice of some components of a plan, she was never informed of all that was expected of her and what the time frame was to accomplish what was required.

In her testimony at the goal-change hearing, J.T. explained how she was (allegedly) prejudiced by lack of a clear case plan. She told Magistrate Judge Albert that she "wasn't told that [she] was supposed to do" an extended psychiatric/psychological evaluation until a couple of months after she did the initial DBH evaluation, and that she "didn't get" — i.e., never understood prior to the hearing — that she was to do the extended evaluation when she was "clean[.]" She testified that she requested the extended evaluation after she received a document telling her what she was supposed to do, but was "given the run around" because she did not have a current referral. She explained that she did not let the therapist she began seeing in January 2018 know about "the court piece" until she "got the confirmation from [her] lawyer" (presumably, the attorney who had been appointed to represent her in October 2018, replacing the first two attorneys who had been appointed to represent her) regarding what she needed to present to the court.

J.T.'s testimony was corroborated to an extent by the testimony of social worker Morris, who told the court that DBH sent a notification stating that it could "no longer offer an extended evaluation because of the time lapse[.]" Mr. Morris also testified that although he spoke "face to face" with J.T. about other providers who might be able to do an extended evaluation, he did not have any written

communications with J.T. regarding services. He told the court that he sat down with J.T. to do a draft of a case plan, but never printed out a finalized plan for her to sign; he stated at one point in his testimony that he was "not sure there is a case plan that has been done . . . ." Mr. Morris, who told the court that he was assigned to J.T.'s case in September 2016, further testified that he let J.T. know if "the parent is not making any progress[,] the agency will make a move to recommend an alternative goal of either guardianship or adoption[,]" and that "the child is not expected to be in foster care longer than 22 months[,]" such that J.T. needed to make progress "quickly to have the child reunified with her."

We noted in *A.I.* that CFSA policy requires in each neglect case a case plan that, *inter alia*, is to be written in plain language, signed by the parent, approved and signed by the social worker's supervisor, and distributed to the parent, the court, and agency staff.[19] *See A.I.*, 211 A.3d at 1125 (also recognizing that "permanency planning should be a collaborative effort between CFSA and the parent[]"); *see also* D.C. Code § 4-1301.09(d), (d)(1) (2019 Repl.) ("[T]he agency

---

[19] We cautioned, however, that these requirements "may not . . . be used as a sword, particularly where the parent is unwilling to cooperate." *A.I.*, 211 A.3d at 1125. Thus, for example, "if a parent is given meaningful opportunities to participate in case planning, a parent's obstruction of the case planning process or decision not to sign the case plans will not prevent CFSA from proceeding with case planning without the parent." *Id.* at 1125-26.

. . . shall assure . . . [t]hat each child has a case plan"); D.C. Code § 4-1301.02(3),(3)(B) (2019 Repl.) (defining "[c]ase plan" as a "written document" that includes a plan for assuring that services are available to the parents in order to facilitate the return of the child to his home) (internal quotation marks omitted). In this case, the evidence established that the agency failed to share a written case plan with J.T. While this failure to comply with § 4-1301.09(d)(1) and with CFSA policy does not necessarily mean that the agency failed to provide J.T. with "a reasonable plan for achieving reunification" within the meaning of *Ta.L.*, 149 A.3d at 1078, it does require that we closely scrutinize the record to assure ourselves that J.T. was on notice about what the court required of her in order to avoid a permanency-goal change that could lead to a termination of her parental rights. Our need to do so is underscored by Mr. Morris's testimony about the advice he gave to J.T., which may have suggested to her that she had until halfway through 2018 (i.e., 22 months after D.T.'s removal from J.T.'s home) to show adequate progress, and further suggested that guardianship — rather than adoption — could be the ultimate disposition if J.T. did not make adequate progress.

In the end, we are persuaded that, for *Ta.L.* purposes, the lack of a formal case plan was harmless error in this case. Magistrate Judge Albert apparently discredited J.T.'s testimony that she had not understood that she was to do the

extended evaluation when she was "clean"; the court found that J.T. "was well aware that sobriety was a requirement to complete the extended mental health evaluations . . . ." Further, when the court changed D.T.'s permanency goal to a sole goal of guardianship in August 2017, it did so over the objection of CFSA, which had urged the court to change the goal to adoption because of J.T.'s continued drug use and non-participation in drug treatment and mental health services. Thus, by August 2017, J.T. could not reasonably have thought that she had another year before she was at risk of having the court change D.T.'s permanency goal to adoption. In addition, we are satisfied that the agency "identif[ied] the barriers to reunification and . . . recommend[ed] appropriate services designed to address the needs" of D.T. and J.T., which is what a written case plan would have done. *A.I.*, 211 A.3d at 1127. The record amply supports the trial court's finding that CFSA repeatedly urged J.T. to refrain from using drugs, to drug test, to have an APRA assessment, and to engage in mental health services, and also repeatedly offered to connect her to services. The record also supports the trial court's finding that J.T. was aware that sobriety was required for unsupervised visitation and eventual reunification. By her own admission, J.T. understood that she was to "link up with mental health services" and "test weekly," and she acknowledged that she did not complete an APRA assessment or engage in drug treatment because she "didn't feel that there was a need" for her to do so.

We therefore conclude, much as we did in *In re Z.W.*, 214 A.3d 1023 (D.C. 2019), that J.T.'s objection to the lack of a formal, written case plan is merely "technical, rather than substantive," because J.T. has "fail[ed] to show . . . any prejudice from lack of a written, filed case plan." *Id.* at 1038, 1039 n.31.

J.T.'s final objection to the permanency-goal change is that the trial court ordered the change even though there was no evidence or testimony that permanent guardianship by Mr. S., rather than adoption, would lead to anxiety and uncertainty for D.T., and no basis to think that a guardianship would leave D.T. at risk of re-entering foster care (the danger cited by the CFSA social worker). J.T. asserts that the trial court relied on mere speculation in reasoning that J.T. might at some point seek to terminate a guardianship, and she faults the court for not considering the impact of severing the relationship between mother and son.

Nothing in *Ta.L.* expressly mandates that when the trial court issues its post-hearing ruling on whether to order a permanency-goal change from reunification to adoption, the trial court must weigh and explain the merits of adoption versus permanent guardianship. To the contrary, we said in *Ta.L.* that if the government

satisfies its burden at the hearing — i.e., its burden to show by a preponderance of the evidence that it provided the parent with a reasonable plan for achieving reunification, that it expended reasonable efforts to help the parent ameliorate the conditions that led to the child being adjudicated neglected, and that the parent has failed to make adequate progress towards satisfying the requirements of that plan — "a change of permanency goal from reunification to adoption would be *presumptively* consistent with the requirement that we act in the best interest of the child." 149 A.3d at 1078 (emphasis added). Nevertheless, we are satisfied, as was the reviewing associate judge, that the magistrate judge did consider D.T.'s particular situation in determining that adoption was the more suitable permanency goal for D.T. The magistrate judge found that because of J.T.'s untreated mental illness and "lack[] [of] insight into her circumstances," J.T. would have "the unlimited ability to return to the [c]ourt time and time again" to modify or terminate the guardianship, efforts that would lead to uncertainty and anxiety for *any* child. Such motions would not be permitted if D.T. were adopted. The court reasonably found that adoption was the more permanent option for D.T.[20]

---

[20] Moreover, as noted above, J.T. has sought a review by an associate judge of the final order of adoption and presumably will be able to raise in that proceeding, and in any appeal that follows, the issue of whether the magistrate judge gave adequate consideration to guardianship as a permanency arrangement for D.T. *See* D.C. Code § 16-2383(c)-(c)(2) (2013 Repl.) (permitting the trial court to issue a guardianship order if the court finds that permanent guardianship is in

(continued…)

For all the foregoing reasons, we affirm the judgment of the Superior Court changing D.T.'s permanency goal to adoption.

*So ordered.*

MCLEESE, *Associate Judge*, dissenting: As the court explains, *supra* at 1-3, this appeal is from an order entered in a neglect case, changing the permanency goal from guardianship to adoption. That order did not terminate the neglect proceeding, and thus under general principles the order would ordinarily be treated as nonfinal and nonappealable. *See, e.g.*, *Khawam v. Wolfe*, 84 A.3d 558, 574 (D.C. 2014) (to be final, order "must dispose of the whole case on its merits so that the court has nothing remaining to do but to execute the judgment or decree already rendered") (internal quotation marks omitted); D.C. Code § 11-721(a)(1) (2012 Repl.) (giving D.C. Court of Appeals jurisdiction over appeals from final orders of D.C. Superior Court). The court concludes that the order at issue is

---

(…continued)
the child's best interests and that adoption and a termination of parental rights are not appropriate for the child).

nevertheless appealable. *Supra* at 6-14. I do not agree, and I would dismiss this appeal for lack of a final order. I therefore respectfully dissent.

This court has recently permitted parents to appeal from orders in neglect proceedings that change a permanency goal from reunification to adoption, even though such orders are not final in the traditional sense. *In re Ta.L.*, 149 A.3d 1060, 1073-76 (D.C. 2016) (en banc). The court emphasized that such orders "effectively put[] the case on an almost unalterable path to adoption," and "tend[] to make the granting of the adoption petition and the consequent termination of parental rights a *fait accompli*." *Id.* at 1074, 1075. In that context, the court held, "the parents' right to timely challenge the effective severing of their relationships with their children" outweighed the costs of the delay that might result from permitting appeal before the trial court finally ruled on an adoption petition. *Id.* at 1075, 1081.

The court has since extended that holding of *In re Ta.L.*, to permit a parent to appeal from an order changing from concurrent goals of reunification and adoption to a sole goal of adoption. *In re J.M.*, 193 A.3d 773, 780-81 (D.C. 2018). We explained that such an order "might lead to a situation that destroys family bonds" and "presumably has allowed the District to divert resources from

reunification to adoption." *Id.* at 781 (brackets, ellipses, and internal quotation marks omitted).

In the present case, J.T. did not object to changing the permanency goal from reunification to guardianship, did not seek review of the order making that change, and even now does not seek a return to a goal of reunification. By acquiescing in guardianship, J.T. agreed to cede critical parental rights, including the right to live with the child, care for the child, and make day-to-day decisions on behalf of the child. D.C. Code § 16-2389(a) (2012 Repl.). An order changing the permanency goal from guardianship to adoption could ultimately lead to important consequences, because guardianship does not terminate the parent-child relationship, whereas adoption does. D.C. Code §§ 16-2389(c), -312. But such an order is substantially less consequential than the order at issue in *In re Ta.L.*, which this court viewed as effectively foreclosing the possibility that parents could ever achieve full reunification with the child. 149 A.3d at 1074-75, 1081. And our decision in *In re J.M.* rested on an assumption that the order at issue there would shift resources away from the goal of reunification. 193 A.3d at 781. In the present case, however, no one seeks a return to a goal of reunification.

In sum, the goal change at issue in this case -- from guardianship to adoption -- does not implicate one of the central justifications the court relied on in *In re Ta.L.* and *In re J.M.* for taking the unusual step of permitting appeal from orders that are not final in the traditional sense. Moreover, permitting appeal of orders changing the permanency goal from guardianship to adoption raises a number of questions and concerns: (1) Are orders changing the permanency goal from reunification to guardianship also appealable? (2) If not, why not? (3) If so, does that mean that parents could take multiple appeals challenging changes to permanency goals, exacerbating the well-recognized concern about delaying the final resolution of neglect proceedings? *See generally, e.g.*, *In re J.G.*, 831 A.2d 992, 1001 (D.C. 2003) ("[T]here is a strong public policy, enhanced by federal legislation, disfavoring the protracted retention of children in foster care . . . .") (footnote omitted). (4) What standards should this court create to govern review of an order changing a permanency goal from guardianship to adoption, given that the standards created in *In re Ta.L.* are focused on reunification? *See, e.g.*, *In re Ta.L.*, 149 A.3d at 1079-80 (requiring trial court to consider whether the District of Columbia made adequate effort to reunify, whether goals set for parents were appropriate and reasonable, and whether options other than termination of parental rights had been adequately explored).

I recognize that there is broad language in *In re J.M.* indicating that immediate appellate review is available "whenever there is a permanency-goal change resulting in a sole goal of adoption." 193 A.3d at 780. *In re J.M.* did not involve a goal of guardianship, however, and thus the court had no occasion to address the different considerations raised in that context. Under the circumstances, we are not bound by the broad language in *In re J.M. See, e.g.*, *Richman Towers Tenants' Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 598 (D.C. 2011) ("[The] words of our opinions are to be read in the light of the facts of the order under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.") (emphasis and internal quotation marks omitted).

I agree with the court that this appeal has at times been litigated, in my view incorrectly, as though the question of reunification was still at issue. *Supra* at 8-14. Nevertheless, the order on appeal in fact changed the permanency goal from guardianship to adoption, and even now J.T. seeks only to reinstitute the goal of guardianship, not to unravel the case all the way back to the original goal of

reunification. I therefore do not believe that the manner in which the appeal has been litigated confers jurisdiction on this court that otherwise does not exist.

For the foregoing reasons, I would hold that the court lacks jurisdiction over this appeal from a nonfinal order changing the permanency goal from guardianship to adoption. I therefore would dismiss the appeal, and I respectfully dissent from the court's decision to resolve the matter on the merits.